## BULK DISTRIBUTION CENTERS, INC., Plaintiff,

### v.

**MONSANTO COMPANY, United States Steel Corporation, Exxon Chemical Americas, State of Florida Department of Environmental Regulation; and Broward County Environmental Quality Control Board, Defendants.**

### No. 83–6805–CIV–JAG.

United States District Court, S.D. Florida, N.D.

June 19, 1984.

Richard Pettigrew, Morgan, Lewis & Bockius, Miami, Fla., for plaintiff.

Barry Malter, Mitchell H. Stabbe, Holland & Knight, Washington, D.C., for Monsanto.

Hendrick G. Milne, Squire, Sanders & Dempsey, Miami, Fla., for U.S. Steel.

Alvin B. Davis, Steel, Hector & Davis, Miami, Fla., Theodore L. Garrett, Washington, D.C., for Exxon.

Paul J. Ezatoff, State of Florida Dept. of Environmental Regulation, Tallahassee, Fla., for Dept. of Environmental Regulation.

James E. McDonald, McDermott, Will & Emery, Miami, Fla., for Broward Co. Env. Quality Ctl. Bd.

## ORDER

GONZALEZ, District Judge.

### I.

IN THIS ACTION the operator of a chemical transloading facility seeks a declaratory judgment as to the liability of three private chemical manufacturers for an alleged hazardous release at the operator's premises. The Declaratory Judgment Act, 28 U.S.C.A. §§ 2201; 2202 (1982), does not serve as an independent source of subject-matter jurisdiction, *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950); *Williams v. Wood*, 612 F.2d 982, 984 n. 1

(5th Cir.1980), and thus federal jurisdiction is premised on section 9613(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA" or "Act"), 42 U.S.C.A. §§ 9601–9657 (1983), and section 505 of the Clean Water Act, 33 U.S.C.A. § 1365 (1978).[1] The doctrine of pendent jurisdiction makes possible this court's review of plaintiff's state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The controlling questions include whether the government must approve a private claimant's clean-up plan before it can commence a cost-recovery action under section 9607(a)(4)(B) of CERCLA; whether a private claimant can incur response costs consistent with the national contingency plan without first obtaining government approval of its plan; whether a "demand letter" lacking a specific reference to a "sum certain" is legally sufficient; and whether an administrative agency's threatened action to compel a person to clean up a hazardous release presents an actual controversy under the Declaratory Judgment Act? After reviewing the motions and memoranda submitted by all parties concerned, the court concludes that plaintiff's complaint should be dismissed without prejudice.

## II.

Plaintiff Bulk Distribution Centers, Inc. ("Bulk") is a corporation whose principal business involves the transfer or transloading of materials, including chemical products, from railroad cars to trucks for subsequent shipment. Bulk operates a transloading facility at Port Everglades, in Ft. Lauderdale, Florida, providing services to corporate defendants Monsanto Company ("Monsanto"), United States Steel Corporation ("U.S. Steel"), and Exxon Chemical Americas ("Exxon").[2] Bulk maintains that its services included

> the temporary storage of railroad tank cars of the shippers on spur railroad track owned by Seaboard Systems Railroad, Inc. and leased by Bulk; and the transloading of materials from railroad cars to tanker trucks using, in the case of EXXON, a pumping device designed under EXXON's specifications and meeting EXXON's prior approval.

Plaintiff's Memorandum in Response to Defendants' Motions to Dismiss or for Summary Judgment at 2 (filed Feb. 27, 1984) (citing Complaint ¶¶ 10, 11).

During transloading operations between January 1978 and May 1983, Bulk's Port Everglades terminal was the site of periodic releases of toxic chemicals known as phthalate esters.[3] Although the cause of the spill is uncertain, soil analysis allegedly has traced the phthalate esters handled by Bulk to separate lots belonging to Monsanto, U.S. Steel, and Exxon.[4]

---

1. Section 1365 of the Clean Water Act does not confer jurisdiction on this court because Bulk has not demonstrated that it actually is in violation of an order issued by the State of Florida. *See* 33 U.S.C.A. § 1365(a)(1)(B) (1983). Bulk's failure to present the Florida Department of Environmental Regulation with a satisfactory clean-up proposal may eventually lead to an enforcement action, but thus far the State has issued only warning notices.

 Bulk also alleges that the Federal Question Statute, 28 U.S.C.A. § 1331 (West Supp.1984), confers jurisdiction on this court to consider the case. The federal question posed by Bulk's complaint is dependent upon its ability to avail itself of rights under either CERCLA or the Clean Water Act. Because Bulk can do neither, its reliance on section 1331 is of no consequence.

2. Exxon Chemical Americas is a division of Exxon Chemical Company, which in turn is a division of the Exxon Corporation.

3. An ester is the name given to a hydrocarbon molecule containing both a carboxylic and an alcohol group. Phthalate esters are the most commonly used plasticizers for polyvinyl chloride and other polymeric materials requiring plasticizers. If sufficient concentrations of these agents are released onto tissue, they can cause various degrees of irritation, depending on their structure. The teratogenic effects of phthalate esters has been found to be molecular weight- and dose-dependent. L. Casarett & J. Doull, Toxicology 609, 620 (1975).

4. Between January 11, 1978 and June 24, 1981, Bulk handled ninety-one railroad cars containing 13,588,280 lbs. of Monsanto's phthalate esters. From September 1, 1980 to May 1, 1983,

By letter dated March 14, 1983, Bulk received from defendant Broward County Environmental Quality Control Board ("BCEQCB" or "Board") a Warning Notice stating that the Board had "reason to believe" that the phthalate ester spill violated section 27–5.031(5) of the BCEQCB's Regulations because it constituted an unauthorized "discharge of hazardous/toxic substances [in]to tidal, fresh, or ground waters ...." Plaintiff's Exhibit A–1. The BCEQCB instructed Bulk to submit to the Board a proposal to clean up the spill "that is signed and sealed by [a] professional engineer registered in the State of Florida." *Id.* Bulk was *not* to commence clean up until the BCEQCB "reviewed" and presumably approved the plan. The Warning Notice further stated that failure to respond to the Board's directive *"may* result in the issuance of a Notice of Violation and a Notice of Hearing to Assess a Civil Penalty" under county regulations. *Id.* (emphasis added).

The Board's letter prompted Bulk to retain the services of Enviropact, Inc., an environmental consulting firm, to conduct a remedial assessment of the spill site and to draft a clean-up proposal. Enviropact's report and recommendations, contained in a letter to Bulk dated April 12, Plaintiff's Exhibit A–4, were general in nature and did not meet with the Board's approval. Plaintiff's Exhibit A–6. The defendant Florida Department of Environmental Regulation ("DER"), which had been apprised of and involved in overseeing the clean up of the Port Everglades spill since April 1983, also disapproved of Bulk's remedial proposal. Plaintiff's Exhibit A–7.

In the ensuing weeks, the DER and the BCEQCB rejected a second clean-up plan, and Bulk's efforts to negotiate a solution with the corporate defendants also proved unsuccessful. Plaintiff's Exhibits A–12, –13(a)–(c). Monsanto, U.S. Steel, and Exxon all contested their liability, with Exxon specifically foreclosing any further discussion of cost reimbursement "until the [Board] and Bulk have agreed upon a cost-effective remedial plan for the site and all the costs associated with that plan have been fully defined." Plaintiff's Exhibit A–14, at 1. No apparent progress having been made, the DER notified Bulk by letter dated July 6 that it may be subject to an enforcement action unless it timely submitted a satisfactory engineering proposal to clean up the Port Everglades site. Plaintiff's Exhibit A–15. In response to that letter, Bulk informed the corporate defendants of its intention to litigate their liability under CERCLA in advance of the clean-up operation. Plaintiff's Exhibit A–16, at 2. By its own admission, Bulk's planned legal action was necessary because of the serious financial hardship posed by a unilateral clean-up effort, Plaintiff's Exhibits A–3, at 3; A–17, at 3,[5] and was contingent upon the state and county filing a suit in state court to order the clean up of the phthalate ester spill. Plaintiff's Exhibit A–16, at 2.[6]

■ Although neither the DER nor the BCEQCB has instituted formal legal pro-

---

Bulk transloaded 10,154,320 lbs. of phthalate esters from U.S. Steel's sixty-two railroad cars. Between May 26, 1982 and May 1, 1983, Bulk handled twenty-five railroad cars containing 4,538,695 lbs. of phthalate esters owned by Exxon. Complaint ¶¶ 14–16 (filed Nov. 10, 1983).

**5.** In its letter to the DER dated July 15, 1983, plaintiff writes: "If [Bulk] cannot afford the cleanup program, it will be forced to either litigate the shippers' liabilities in advance of further work or to seek the protection of the bankruptcy court." Plaintiff's Exhibit A–17, at 3.

**6.** In a letter to corporate defendants dated July 14, 1983, Bulk writes:

... [I]f we are unsuccessful [in gaining state approval of its clean-up plan], then Bulk Distribution Centers, Inc. has no choice but to advise the state and the county that it is unable to go forward with a more costly cleanup program. We expect then that the state and the county will file suit in state court. At that time we intend to remove the case to the federal court and to seek a declaratory judgment with respect to [the corporate defendants] and [Bulk's] respective liabilities for contribution or indemnity in connection with all costs of cleanup.

Plaintiff's Exhibit A–16, at 2.

ceedings against Bulk for its failure to clean up the chemical spill, Bulk nevertheless initiated this action seeking a declaration of its right to contribution or indemnity against the corporate defendants under both CERCLA and state law for any costs Bulk may incur in cleaning up its Port Everglades facility. The corporate defendants have in turn filed motions to dismiss or in the alternative for summary judgment,[7] principally arguing that plaintiff's complaint is either not ripe for review or fails to state a claim upon which relief can be granted.[8]

## III.

With elections quickly approaching and the memory of the environmental disaster known as Love Canal[9] still fresh in their minds, members of the Ninety-sixth Congress passed the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. §§ 9601–9657 (1983). CERCLA's legislative history is riddled with uncertainty because lawmakers hastily drafted the bill, and because last minute compromises forced changes that went largely unexplained.[10] The lack of a clear legislative record has proven particularly burdensome in this case.

CERCLA was necessary because its precursor, the Resource Conservation Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6987 (1976 & Supp. II 1978), *as amended by* Solid Waste Disposal Act Amendments of 1980, Pub.L. No. 96–482, 94 Stat. 2334, was not equipped to regulate the clean up of abandoned hazardous waste sites. *See United States v. Northeastern Pharmaceutical and Chemical Co.,* 579 F.Supp. 823 at 839 (W.D.Mo.1984); Dore, *The Standard of Liability for Hazardous Waste Disposal Activity: Some Quirks of Superfund,* 57 Notre Dame Law, 260, 265–67 (1981). RCRA authorized the Environmental Protection Agency ("EPA") to require continuous monitoring of ongoing disposal sites, but applied to inactive sites only to the extent that they posed an "imminent hazard". H.R.Rep. No. 1016, 96th Cong., 2d Sess. 18, *reprinted in* 1980 U.S. Code Cong. & Ad.News 6119, 6120. CERCLA picked up where RCRA left off by establishing a means of controlling and financing both governmental and private responses to hazardous releases at abandoned and inactive waste disposal sites. *See State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1312 (N.D.Ohio 1983); *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1142–43 (E.D.Pa.1982);

---

7. Defendant DER withdrew its motion to dismiss at the eleventh hour.

8. Corporate defendants also urge the court to abstain from reviewing plaintiff's case. The court rejects this argument, finding that the abstention doctrine, in either of two forms, has no application in this case. *Burford*-type abstention, *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), which counsels against federal proceedings that will impair the state's effort to implement its own policy, is of no moment here because corporate defendants have not specifically demonstrated that the outcome of this proceeding will undermine relevant state law or policy, or interfere with the state's own ability to institute an enforcement action. *Compare* the relationship between federal and state laws in this case *with* the noticeable interference with state law and policy posed by the imposition of federal law in *Ada-Cascade Watch Co. v. Cascade Resource Recovery Inc.,* 720 F.2d 897 (6th Cir.1983).

 *Younger*-type abstention, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), also does not apply in this case because at

present there are no ongoing state judicial proceedings.

9. The "Love Canal" incident involved the disposal of highly toxic organic waste in a Niagara Falls, New York, community by Hooker Chemical Company. The leakage of hazardous wastes from the dumpsite was so serious that it became the first non-natural disaster to be declared a national disaster. Comment, *Generator Liability Under Superfund for Clean-up of Abandoned Hazardous Waste Dumpsites,* 130 U.Pa.L.Rev. 1229, 1231 n. 16 (1982). For a review of the Love Canal debacle, see A. Levine, Love Canal: Science, Politics, and People (1982).

10. For a review of CERCLA's perplexing legislative history, see Eckhardt, *The Unfinished Business of Hazardous Waste Control,* 33 Baylor L.Rev. 253 (1981); Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980,* 8 Colum.J.Envtl.L. 1 (1982); Note, *Liability for Generators of Hazardous Waste: The Failure of Existing Enforcement Mechanisms,* 69 Geo.L.J. 1047, 1056–81 (1981).

H.R.Rep. No. 1016, 96th Cong., 2d Sess. 25, *reprinted in* 1980 U.S.Code Cong. & Ad. News 6119, 6125, 6128.

The most significant feature of CERCLA is its $1.6 billion Hazardous Substance Response Fund ("Superfund" or "Fund"), which provides money for government or private clean up of a hazardous substance spill. Superfund is financed through an excise tax imposed upon generators of chemical and petroleum products and upon operators of hazardous waste sites, as well as from general appropriations. 42 U.S.C.A. § 9631 (1983).

To file a claim against the Fund, a "release"[11] of a "reportable quantity"[12] of a "hazardous substance"[13] must first occur. Thereafter, a private party must make a demand for costs incurred in cleaning up the spill upon known responsible persons and wait sixty days for satisfaction of the

**11.** In pertinent part, CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment [of a hazardous substance]." 42 U.S.C.A. § 9601(22) (1983).

**12.** Reportable releases of hazardous substances are to be determined by reference to the quantities established under the Clean Water Act. *See* 40 C.F.R. § 117 (1983).

**13.** Section 9601(14) of CERCLA defines "hazardous substances" as (a) a substance designated as hazardous under 33 U.S.C. § 1321(b)(2)(A); (b) any "element, compound, mixture, solution, or substance" designated as hazardous by the administrator of the EPA pursuant to the authority granted under 42 U.S.C. § 9602; (c) any substance having the characteristics identified under 42 U.S.C. § 6921; (d) any toxic pollutant listed under 33 U.S.C. § 1317(a); (e) any hazardous air pollutant listed under 42 U.S.C. § 7412; (f) any "imminently hazardous chemical substance or mixture" with respect to which the EPA has taken action pursuant to 15 U.S.C. § 2606.

Phthalate esters are "hazardous substances" within the meaning of CERCLA. Section 1317(a) of the Clean Water Act, to which section 9601(14) refers, directs the EPA to issue a list of toxic pollutants, which appears at 40 C.F.R. § 401.15 (1983). Phthalate esters are among the sixty-five substances listed by the EPA as toxic pollutants.

**14.** 42 U.S.C.A. § 9607(a) provides as follows:

demand. 42 U.S.C.A. § 9612(a) (1983). If reimbursement is not forthcoming, the claimant may then either obtain payment from the Fund or sue the responsible persons under section 9607(a)(4)(B).[14] When polluters are unknown, a claim for specified damages may be filed against the Fund. Payment of claims by the Fund subrogates the Fund to the rights of the claimant, so that Fund representatives can later attempt to recover claim payments from the party statutorily responsible for the hazardous substance release. 42 U.S.C.A. § 9612(c) (1983).

Persons potentially liable under CERCLA include present and former owners of hazardous substances disposal sites, transporters of hazardous substances, and those who arrange for the transport of disposal of hazardous substances. *Id.* § 9607. Parties found responsible for a hazardous re-

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

lease may be held strictly liable [15] for either damage to natural resources or government or private response costs incurred as the result of a release or threatened release, *id.* § 9607(a)(4)(A)–(C); and if they worked in concert to produce a single indivisible release or threatened release, then they may be held jointly and severally liable for the claimant's response costs if the applicable state law so provides. *See Northeastern,* at 844–845.[16]

Although private parties may recover response costs under section 9607(a)(4)(B), the fact remains that much of CERCLA's language deals with government-sponsored clean-up efforts. Superfund provides a reliable way for the government to pay for the clean up of *some* abandoned and inactive waste sites. Such sites generally require prompt attention, and may lack a readily identifiable responsible party from whom compensation can be sought. With Congress' attention focused on government involvement in waste site clean up, it comes as no surprise that those portions of CERCLA's text and legislative history discussing a private party's rights against *other private parties* vis-à-vis the Fund are ill-defined.

Section 9607(a)(4)(B), which provides that parties responsible for a hazardous release also are liable for "any other necessary costs of response incurred by *any other person* consistent with the national contingency plan," appears on its face to authorize private cost recovery actions. Indeed, of the few courts that have studied the issue, most have indicated, although not necessarily held, that section 9607(a)(4)(B) does empower a private party to seek compensation from other responsible parties

for costs incurred in cleaning up a spill site. *See Cadillac Fairview/California v. Dow Chemical Co.,* Nos. 83–7996–LTL, 83–8034–LTL (C.D.Cal. Mch. 5, 1984) (private cost recovery action may be permissible if site in question is on National Priorities List); *United States v. Northeastern Pharmaceutical and Chemical Co.,* 579 F.Supp. 823 (W.D.Mo.1984) (government entitled to declaratory relief because it demonstrated that it already had incurred compensable costs); *D'Imperio v. United States,* 575 F.Supp. 248 (D.N.J.1983) (private action for declaratory relief failed to present actual controversy because final agency action, including enforcement proceeding, was incomplete and speculative, respectively); *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio 1983) (State successfully brought § 9607(a)(4)(A) action to recover costs of cleaning up private dumpsite). As explained in *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1142 (E.D.Pa.1982), a case in which the City successfully stated a claim to recover the costs of cleaning up an industrial waste site located on public property,

> ... [CERCLA] is designed to achieve one key objective—to facilitate the prompt cleanup of hazardous dump sites by providing a means of financing both governmental and private response and by placing the ultimate financial burden upon those responsible for the danger. The liability provision is an integral part of the statute's method of achieving this goal for it gives a private party the right to recover its response costs from responsible third parties ....

**15.** Although the term "strict liability" is not used in section 9607(a), section 9601(32) of the Act incorporates the strict liability standard set forth in section 311 of the Clean Water Act, 33 U.S.C.A. § 1321 (West Supp.1984). As explained in *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1140 n. 4 (E.D.Pa.1982),

[t]he legislative history clearly establishes Congress' understanding that it was incorporating a standard of strict liability into CERCLA. *See, e.g.,* 126 Cong.Rec. S14964 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph) ("[w]e have kept strict liability in the compro-

mise, specifying the standard of liability under section 311 of the Clean Water Act ..."); 126 Cong.Rec. H11787 (daily ed. Dec. 3, 1980) (remarks of Rep. Florio) ("[t]he standard of liability in these amendments is intended to be the same as that provided in section 311 of the [Clean Water Act]; that is, strict liability.").

**16.** For a discussion of joint and several liability under CERCLA, see Note, *Joint and Several Liability For Hazardous Waste Releases Under Superfund,* 68 Va.L.Rev. 1157 (1982).

The administrative regulations interpreting CERCLA complement private cost recovery actions by promoting private clean-up efforts. The EPA writes that "[i]n determining the need for and planning or undertaking Fund-financed action, response personnel should, to the extent practicable, ... [c]onserve Fund monies by encouraging private party clean-up." 40 C.F.R. § 300.61(c)(2) (1983).

The private cost recovery action authorized by section 9607(a)(4)(B) is necessary because "the $1.6 billion Superfund itself will not provide sufficient funds for the clean up of the existing dump sites ...." *Georgeoff,* 562 F.Supp. at 1313. Some estimates place the number of sites requiring attention in the thousands, with projected costs for the clean-up effort ranging from $7 billion to $44 billion.[17] Obviously, state and private actions are needed to clean up those sites beyond the reach of Fund-sponsored actions. The private action certainly appears to be a logical method of remedying a hazardous spill at an *active* site, for there the parties involved are present and the need for government action is diminished, although not eliminated altogether.

■ Corporate defendants dispute the availability of the private cost recovery action, arguing that CERCLA is a closely-quartered congressional act that is principally designed to funnel federal funds to a limited number of toxic waste sites. Permitting private actions, they submit, threatens to turn "people loose to go dig up everything around the country ...." 126 Cong.Rec. H9449 (daily ed. Sept. 23, 1980) (discussing overzealous EPA enforcement of CERCLA).

The corporate defendants' concerns are valid, but this court's broader construction of CERCLA does not throw caution to the wind. As explained more fully below, before a private claimant can commence a remedial operation and cost recovery action, it must first win government approval of its clean-up plan. Moreover, even if the private claimant obtains the requisite approval, it must still meet the more rigorous evidentiary burdens implicit in section 9607(a)(4)(B) before it can recover its costs. *Compare* 42 U.S.C.A. § 9607(a)(4)(A) (1983) (government must prove response action "*not inconsistent* with national contingency plan") (emphasis added) *with* 42 U.S.C.A. § 9607(a)(4)(B) (1983) (claimant must prove response action "*consistent* with national contingency plan") (emphasis added). Finally, permitting a private cause of action under section 9607(a)(4)(B) effectuates the legislative purpose of abating environmental hazards promptly, safely, and efficiently. *Cf. Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 23, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) (legislative intent is the most important factor in determining whether a private remedy should be inferred from statutory language).

While private cost recovery actions are permissible under CERCLA, courts disagree on when a claimant may commence its lawsuit. Some courts simply track the language of section 9607(a)(4)(B) and require a party to incur costs "consistent with the national contingency plan" before it may bring its action. *See D'Imperio,* 575 F.Supp. 248; *Stepan,* 544 F.Supp. at 1143. (The national contingency plan ("NCP") establishes procedures and standards for responding to the release of hazardous substances. *See id.* at 1144 n. 16; 42 U.S.C.A. § 9605 (1983)). Still other courts strictly construe section 9607(a)(4)(B) to mean that

---

**17.** At the time that CERCLA was enacted, Congress was aware that the costs of the clean up envisioned would greatly exceed the amount of the Superfund. The legislative history of CERCLA is replete with references to the scope of the problem which Congress faced. Congressmen referred to dump sites requiring clean up numbering in the thousands. The costs for each clean up varied, but numbers in excess of $3 million per site were made throughout the legislative history. A range of figures developed regarding the total cost of this clean up. At a minimum, the low estimate for the clean up was in excess of $7 billion. The highest figure, a figure supported by the EPA, placed the total cost for the clean up at $44 billion. Other references placed the expected cost of the clean up in the range of $13.1 to $22.1 billion.

*Georgeoff,* 562 F.Supp. at 1313 (citations omitted); *see also United States v. Price,* 577 F.Supp. 1103 (D.N.J.1983).

a private party cannot maintain a cost recovery action unless the locality is included on a list of dangerous sites drawn up by the EPA and known as the National Priorities List ("NPL"). *See Cadillac Fairview,* slip op. at 23.[18]

No court has yet faced the question of whether a claimant's clean-up operation must first be approved by the government before a CERCLA cost-recovery action may be maintained.[19] The *Cadillac Fairview* court could have reached this issue but did not because it found that the omission of the dumpsite in question from the NPL rendered the suit not ripe for review.

■ In reviewing this case, the court is mindful that CERCLA must be construed in light of the spirit in which it was written and the reasons for its enactment, *see WTWV, Inc. v. National Football League,* 678 F.2d 142, 143 (11th Cir.1982); *General Service Employees Union Local No. 73 v. NLRB,* 578 F.2d 361, 366 (D.C.Cir.1978), and should be interpreted so as to avoid untenable or unreasonable results. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d

748 (1982); *United States v. Cruz,* 698 F.2d 1148, 1151 (11th Cir.1983).[20]

## IV.

■ In *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), the Supreme Court of the United States explained that for a case to be justiciable under the Declaratory Judgment Act, it must present "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 273, 61 S.Ct. at 512; *see Hendrix v. P.V. Poonai,* 662 F.2d 719 (11th Cir.1981). However, a case is not susceptible—or ripe—for judicial review "if a prospective examination of the controversy indicates that future events may affect ... its present justiciability, either by making a later decision more apt or by demonstrating directly that the matter is not yet appropriate for adjudication by an article III court." L. Tribe, American Constitutional Law § 3–13, at 61 (1978). The justiciability of a case, and the availability of declarato-

18. The result in *Cadillac Fairview* is neither supported by the NCP nor the case law. 40 C.F.R. 300.67(a)(2) (1983), *infra* note 21, permits recovery actions for costs incurred in planning and implementing a "planned removal" of a site not listed on the NPL. A site's inclusion on the NPL does not represent a determination of liability; the list is primarily an informational tool. *See D'Imperio v. United States,* 575 F.Supp. 248 (D.N.J.1983).

19. Whether the BCEQCB's approval of Bulk's clean-up proposal would satisfy the requirements of CERCLA is not clear. In any event, this uncertainty need not be resolved here because neither the Board nor the DER has approved of Bulk's plan. Suffice it to say that if the State, or a legally authorized instrumentality thereof, did approve of the plan, then a cost recovery action may be brought under section 9607(a) provided all other conditions precedent have been satisfied. *See generally* 40 C.F.R. §§ 300.24(c), 300.32(7)(iv), 300.61(c), and 300.-62 (1983) (addressing or authorizing state, and under some circumstances, local administration of clean-up operations). State involvement in a CERCLA-related action does not necessarily pose a federal preemption problem. *See* Note, *Issues of Federalism in Hazardous Waste Control: Cooperation or Confusion?,* 6 Harv.Envtl.L.

Rev. 307, 319–24 (1982); Note, *The Preemptive Scope of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980: Necessity for an Active State Role,* 34 U.Fla.L. Rev. 635 (1982).

20. CERCLA's provisions and the EPA regulations promulgated thereto contain little language specifically addressing ·the steps that a private claimant must take in order to commence a cost recovery action. Almost every court interpreting the Act and the EPA regulations has indicated, however, that a private claimant does have the right to bring a cost recovery action against other private parties under section 9607(a)(4)(B). Thus, if the court is to permit a private right of action under CERCLA, then some statutory basis must be identified. There is, of course, the express language of section 9607(a)(4)(B). Much also is to be learned, however, from other portions of the Act and the EPA regulations that address government-sponsored response actions. Accordingly, in this decision, the court relies on or analogizes to specific provisions of CERCLA or the NCP that on their face may refer to government clean-up operations, because they give some indication of what a private claimant must do to succeed in its own action under section 9607(a)(4)(B).

ry relief, are left to the discretion of the trial court. 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2759 (2d ed. 1983). The "actual controversy" requirement is a threshold barrier that plaintiff must successfully hurdle before the court can reach the merits of the case.

Upon initial examination, section 9607(a)(4)(B) might seem to be the starting point for determining whether this case presents an actual controversy. The analysis would require plaintiff to demonstrate that it has incurred costs cleaning up the Port Everglades spill, and that those costs are consistent with the NCP. The court finds, however, that there remains an even more fundamental prerequisite to a private cost recovery action: the existence of a state or federally approved clean-up proposal. As explained below, without an approved plan, there can be neither recoverable costs nor a clean-up effort consistent with the NCP.

Congress passed CERCLA principally to protect the public and the environment from the dangers posed by an actual or threatened hazardous release. See supra p. 1441 and accompanying notes. Achievement of this goal is not realized easily, for environmental controversies often involve parties whose interests are widely divergent. For example, the party who seeks reimbursement for clean-up costs probably is eager to implicate others in the hope of lessening its own financial liability for the spill. Both the claimant and other parties ultimately implicated are concerned with the cost of the clean-up operation; ideally it should be affordable and effective. The general public has similar concerns, for it desires a remedial plan that cleans up the release, but at a price that is sufficiently low that its eventual cost can be internalized by the company.

The instant case dramatically illustrates these conflicting interests. Bulk has demonstrated a desire to help clean up the phthalate ester spill, going so far as to propose a remedial plan. However, neither the state nor the county has approved the plan. Bulk claims that it will go bankrupt if it must clean up the spill alone, and the corporate defendants, whose chemicals are at the center of this controversy, maintain that they have no duty to participate in a joint effort to solve the problem. Meanwhile, the presence of the hazardous substances threatens both the sea life in and around Port Everglades and the general public whose water comes from the water tables below the Bulk site. See Plaintiff's Exhibit A–4.

If the court permitted Bulk to begin clean-up operations without prior government approval, then what assurance would there be that the plan was extensive enough to alleviate the danger given Bulk's limited resources? Moreover, having retrieved the hazardous substances, what assurance would there be that Bulk would dispose of them in such a manner so as to protect the public from future threats posed by the same chemicals?

In this court's view, the only practical way to safeguard the public's interest, while fairly mediating the competing concerns of the parties potentially responsible for cleaning up the release, is for the government to approve the clean-up proposal before it is implemented by the private parties.

The government certainly is in a better position than are private parties to pass judgment on the efficacy of a clean-up proposal. To begin with, state or federal environmental agencies possess scientific and technological sophistication, along with an appreciation of the problems arising from hypertechnical environmental standards. Additionally, the clean-up proposal must comply with laws that the state or federal governments enforce, so it follows that their approval of a plan would be desirable to reduce a party's exposure to liability. See generally Ada-Cascade Watch Co. v. Cascade Resource Recovery, Inc., 720 F.2d 897 (6th Cir.1983).

A review of the relevant legislation and regulations confirms the soundness of requiring government approval of a clean-up plan. Under section 9607(a), the costs for which a responsible party may be liable include governmental response costs and

"any *other* necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C.A. § 9607(a)(4)(B) (emphasis added). The phrase "any other necessary costs of response" indicates that the incurrence of some governmental response costs under CERCLA is a prerequisite to the recovery of "other" response costs incurred by a private party. A contrary interpretation would render the word "other" surplusage. *See National Insulation Transportation Committee v. I.C.C.*, 683 F.2d 533, 537 (D.C.Cir.1982).

The language of the NCP further establishes the need for and extent of government response under CERCLA. (The court looks to the NCP because section 9607(a)(4)(B) directs that a response action be consistent with the Plan.) According to the NCP, once a release of toxic waste is discovered, 40 C.F.R. § 300.63 (1983), a preliminary assessment of the threat presented is made by the "lead agency", defined as

"the Federal agency (or State agency operating pursuant to a contract or cooperative agreement executed pursuant to section 104(d)(1) of CERCLA) that provides the on-scene coordinator or the responsible official." *Id.* § 300.6. If the release threatens an "immediate and significant risk of harm to human life or health or to the environment," then it should be neutralized as quickly as possible. *Id.* § 300.65. If the danger posed by a release is not "immediate and significant," then further investigation is conducted to determine whether a temporary (planned removal, *id.* § 300.67)[21] or permanent (remedial action, *id.* § 300.68)[22] solution is necessary. The planned removal or remedial action should not begin until the proper authorities have approved of the clean-up plan. *See id.* §§ 300.67(b)(3); 300.68(c), (d)(1).

Requiring the federal or state authorities to approve a clean-up proposal before a party can recover its costs also is consistent with CERCLA's emphasis on response

**21.** 40 C.F.R. § 300.67 (1983) provides in relevant part:

(a) Planned removal may be undertaken pursuant to a contract or cooperative agreement when the lead agency determines that:

(1) There would be a substantial cost savings by continuing a response action with the equipment and resources mobilized for an immediate removal action taken pursuant to § 300.64, but terminate pursuant to § 300.64(c); or

(2) The public and/or environment will be at risk from exposure to hazardous substances if response is delayed at a release not on the National Priorities List.

(b) Planned removal must be requested by the Governor of the affected State or his designee. Requests must include:

(1) A description of the nature and extent of the release;

(2) A description of actions taken or underway at the site;

(3) *A description of the proposed planned removal* ....

**22.** 40 C.F.R. § 300.68 (1983) provides in pertinent part:

(a) Remedial actions taken pursuant to this section (other than responses at Federal facilities) are those responses to releases on the National Priorities List that are consistent with permanent remedy to prevent or mitigate the migration of a release of hazardous substances into the environment.

(b) States are encouraged to undertake Fund-financed remedial actions in accordance with § 300.62 of this Plan.

(c) As an alternative or in addition to Fund-financed remedial action, the lead agency may seek, through voluntary agreement or administrative or judicial process, to have those persons responsible for the release clean up in a manner that effectively mitigates and minimizes damage to, and provides adequate protection of, public health, welfare, and the environment. *The lead agency shall evaluate the adequacy of clean-up proposals submitted by responsible parties* or determine the level of clean-up to be sought through enforcement efforts, by consideration of the factors discussed in paragraphs (e) through (j) *of this section.* The lead agency will not, however, apply the cost balancing considerations discussed in paragraph (k) of this section to determine the appropriate extent of responsible party clean-up.

(d)(1) The lead agency, in cooperation with State(s), will examine available information and determine, based on the factors in paragraph (g) of this section, the type or types of remedial response that may be needed to remedy the release. This scoping will serve as the basis for requesting funding for a remedial investigation and feasibility study ....

....

(j) The appropriate extent of remedy shall be determined by the lead agency's selection of the remedial alternative which the agency determines is cost-effective ....

first and reimbursement second. If this case is any indication, few hazardous releases would be cleaned up by private parties if they first had to agree upon a clean-up proposal. A sounder approach is for a claimant to obtain government approval of its plan, and to resolve the matter of costs once the clean-up effort has begun or is complete.[23]

■ The courts and the EPA seem to agree. The *Georgeoff* court observed that "the legislative history of CERCLA indicates that Congress intended to encourage states to respond promptly to the threats posed by hazardous waste dump sites. Response actions were not intended to await a determination of liability." 562 F.Supp. at 1316. Relying on *Georgeoff,* the district court in *United States v. Price,* 577 F.Supp. 1103 (D.N.J.1983), similarly stated that "with respect to § 107, [ ] the government must first begin the cost of clean up and incur some expenses before it can initiate an action." *Id.* at 1110. Additionally, the EPA, whose interpretation of CERCLA is entitled to considerable respect, *see Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, *reh. denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *Veterans Administration Medical Center v. Federal Labor Relations Authority,* 675 F.2d 260, 262 (11th Cir.1982), has made clear in its Memorandum on Cost Recovery Actions Under the Comprehensive Environmental Response, Compensation, and Liability Act (Aug. 26, 1983) [hereinafter cited as EPA Memorandum], that cost recovery actions should follow a partial or completed clean-up operation.

The requirement that a claimant serve a demand letter on other potentially liable parties supports the EPA's view that cost recovery claims may commence once a clean-up effort has begun. The demand letter seeks payment of past or future costs of cleaning up the site, and gives all parties concerned an opportunity to investigate the spill and the available remedies, and negotiate a settlement. *See Ada-Cascade Watch Co. v. Cascade Resource Recovery, Inc.,* 720 F.2d 897 (6th Cir.1983).

■ Presentment of a demand letter to other potentially responsible parties is a condition precedent to bringing a cost recovery action under section 9607(a)(4)(B).[24] This requirement is derived from a reading of sections 9601(4), 9607, and 9612 *in pari materia.* Section 9612(a) provides:

All claims which may be asserted against the Fund ... shall be presented in the first instance to the ... person known to the claimant who may be liable under section 107 of this title. *In any case where the claim has not been satisfied within sixty days of presentation ..., the claimant may elect to commence an action in court against such ... person or to present the claim to the Fund for payment.*

42 U.S.C.A. § 9612(a) (1983) (emphasis added). Section 9601(4) defines a "claim" as "a demand in writing for a *sum certain." Id.* § 9601(4) (emphasis added). Reading these sections together with section 9607(a)(4)(B), it appears that before a private claimant can commence a cost recovery action against other private parties, it must first serve on them a letter demanding a "sum certain" to cover the costs of the clean-up operation.

Bulk points out that several courts have held that section 9607(a) should be read independently of sections 9612(a) and 9601(4) because of the qualifying language at the outset of section 9607(a): "Notwithstanding any other provision or rule of law, and subject to the defenses set forth in subsection (b) of this section ...." *See*

---

**23.** According to the EPA, a cost recovery action can commence after the completion of either the entire clean-up operation or "one phase of a multiphase response." EPA Memorandum, at 15.

**24.** An alternative basis for dismissing this case is Bulk's failure to present corporate defendants with a demand letter for a "sum certain" to cover the costs of the clean-up effort. Bulk maintains that if this deficiency exists, it is either inconsequential or unnecessary because of the qualifying language appearing at the outset of section 9607(a). As more fully explained in the text, Bulk's position is baseless because the demand letter is relevant and an integral part of CERCLA's overall statutory scheme.

*Northeastern,* at 850; *Wehner v. Syntax Corp.,* No. 83–642–C, slip op. at 4 (E.D.Mo. Dec. 30, 1983).

The significance of the *Northeastern* decision is limited because that court gave the introductory language to section 9607(a) an expansive interpretation so it might hold that "[t]he fact that there is not a claim before this Court seeking recovery on behalf of the fund does not bar recovery by the plaintiff." *Northeastern,* at 850. This court agrees with *that* result, but believes that declaring section 9607(a) completely independent of CERCLA's other provisions is inefficient and costly because it permits parties to take unilateral actions when a joint effort may have been possible had the parties attempted to settle their differences before undertaking a response. *See generally Stepan,* 544 F.Supp. at 1143 (court rejected "mechanistic" construction of claims procedure under § 9612(a) and read §§ 9607(a)(4)(B) and 9612(a) together).

The *Wehner* decision is based on the "clear meaning of the statute," yet CERCLA, and section 9607(a) in particular, are hardly clear, and certainly susceptible to the reasonable and practical construction given to them by this court.

If the procedures outlined by the EPA for cost-recovery actions brought by the government are any indication, the demand letter should include a discussion of the chemical spill site, including its location, the nature of the spill, the clean-up efforts already undertaken, and a clear statement of the past and future costs of the response activity broken down into general categories. EPA Memorandum at 16.[25]

In order for a claimant to present the demand letter to other potentially liable parties, it already must have drafted and received government approval of its clean-up plan. Without an approved plan, there is no way that a potentially responsible party can be certain that the plan submitted will in fact be the plan implemented, thus making an estimation of other parties' clean-up costs very difficult to verify. Absent an approved plan, the purpose of requiring a demand letter is defeated because the parties on whom it is served cannot determine with any degree of certainty whether it is financially practicable to participate in the clean-up effort. If after reviewing the plan the other parties refuse to join in the operation, then declaratory relief might be appropriate provided the other requirements of section 9607(a)(4)(B) are satisfied. Although CERCLA antici-

**25.** The first formal step in the commencement of a cost recovery proceeding will be the issuance of a letter of demand from EPA to the potentially responsible party or parties for payment of costs expended on the site. A demand letter should be sent to all parties in a case who have been identified as potentially responsible (i.e., past and present owners/operators of a site and generators and transporters who contributed hazardous substances to a site), and should be issued after all response activity has been completed, or at the completion of one phase of a multiphase response where the entire process will require an extended period of time.

Before a demand letter is sent, the potential case should be analyzed for ... identification of all potentially responsible parties (including responsible individuals in corporations where appropriate) and assembly of cost information. At the time the demand letter is sent, the Agency should be able to answer reasonable questions posed by a recipient of the letter....

The letter should be issued where response costs have been incurred under CERCLA, regardless of whether a decision has been made to initiate a judicial proceeding for cost recovery.

The demand letter should contain the following points:

. . . .

* the location of the site;

* the presence of a hazardous substance which was released or threatened to be released;

* in general terms, the dates and types of response activity undertaken by EPA at the site;

* any notice given to the recipient prior to or during the response activity, allowing the recipient the opportunity to undertake the work or pay the expense of response;

* the total cost of the response activity broken down into general categories;

* a general statement that the Agency believes that the recipient is a responsible party and liable for the sum set forth;

* a demand for payment; ...

EPA Memorandum, at 15–16 (footnote omitted).

pates that parties will resort to the courts to resolve cost recovery actions,[26] they must first be able to ascertain the probable cost of the clean-up operation.

In this case, Bulk timely served on corporate defendants a letter apprising them of the possible costs of cleaning up the Port Everglades spill, Plaintiff's Exhibit A–13(a)–(c), but it was hardly detailed enough to constitute a "demand letter" as a matter of law. The June 17 letter states, in relevant part:

> ... The proposal for a site cleanup has been submitted to the agencies. A copy has been forwarded to you. We would still hope to receive your input concerning the proposal. Bulk will pay one-fourth of its total costs, not to exceed $50,000.00. Thus Bulk could contribute a very substantial percentage of the costs depending upon final costs for consultants, legal fees, and site clean-up. We suggest apportioning the balance of the costs among the shippers. Possible cost sharing formulas could be based on gallonage, poundage, or number of cars shipped to Bulk.

Plaintiff's Exhibit A–13(a), at 2.

According to the letter, Bulk promises to pay no more than $50,000.00 to clean up the site, assuming that the total cost of the response is no more than $200,000.00. But that figure was purely speculative because the clean-up plan then under consideration had not yet been approved by the appropriate agencies. In fact, the state rejected the plan alluded to in Bulk's June 17 letter. Even if the court were to incorporate Bulk's prior correspondences into the June 17 letter, it would still be deficient because at no time did Bulk break down the projected clean-up costs into general categories so

that corporate defendants might assess the reasonableness of the response activity.

Lacking a government-approved clean-up plan, Bulk cannot incur costs consistent with the NCP—which requires the plan to ensure that the remedial effort will be cost-effective and safe—and cannot serve corporate defendants with a demand letter for a "sum certain"—which requires the plan to enable potentially responsible parties to weigh the merits of participating in a joint clean-up effort.

 Even if the state or federal government had approved of its clean-up proposal, Bulk's claim still would not be ripe for review, or alternatively would not state a claim for relief,[27] because the company has not incurred "response costs". Bulk alleges that its previously incurred costs of investigating and drafting proposals to clean up the Port Everglades spill, as well as attorneys' fees, state a claim for relief under section 9607(a)(4)(B). Complaint ¶¶ 23, 24 (filed Nov. 10, 1983). The case law, however, does not support this view.

In *United States v. Price*, 577 F.Supp. 1103 (D.N.J.1983), the court dismissed the government's section 9607(a) action because "the EPA ha[d] not yet undertaken any clean-up effort and as such ha[d] not incurred any costs pursuant thereto." *Id.* at 1110. At most, the facts reveal that the EPA had conducted a site review of the landfill in question, including an investigation of the "geohydrology of the area in an attempt to determine the extent of groundwater contamination ... [and its] likely effect ... on public and private wells located nearby." 523 F.Supp. 1055, 1059 (D.N.J. 1981). A study of feasible solutions, also undertaken by the government, was not

---

26. In many cases, the recipients of demand letters will contact the Agency and express interest in discussing their status as a responsible party. The Agency encourages such negotiations. CERCLA money is limited; Agency cleanup activities deplete the fund and money must be recovered from the parties responsible for the release or threat of release. *Therefore cost recovery through negotiation or litigation is necessary to clean up the greatest number of sites.*

EPA Memorandum, at 16 (emphasis added).

27. In deciding the fate of a Rule 12(b)(6) motion to dismiss, the court must view the facts in the light most favorable to the nonmovant, and the complaint should be dismissed only if "it appears beyond doubt that the [nonmovant] can prove no set of facts that would entitle him to relief." *McKinnis v. Mosley*, 693 F.2d 1054, 1058 (11th Cir.1982) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)).

even completed at the time the EPA filed its suit. 577 F.Supp. at 1110 n. 5. The *Price* court explained that those costs incurred "during the investigatory stage, or in producing the feasibility study," did not entitle the EPA to relief because "the government must first begin the cost of the clean-up and incur some expenses before it can initiate an action." *Id.* at 1110.

Greater significance attaches to *Price* when read along with *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio 1983), a case cited by the *Price* court in support of its decision. In *Georgeoff,* the State of Ohio brought an action against the former owners and operators of a hazardous dump, along with the transporters and generators of the waste, to collect the costs of cleaning up the site. Although the State had only incurred costs equalling less than ten percent of the total projected clean up cost, the court concluded that the money expended was sufficient to state a "claim for previously incurred response costs pursuant to § 9607(a)(4)(B)." *Id.* at 1316. Commenting on the *Georgeoff* decision, the *Price* court observed that "the court in [*Georgeoff*] implied that § 107 was intended to cover only those instances where the government had *already begun the clean-up process* and was seeking reimbursement." 577 F.Supp. at 1110 (emphasis added) (footnote omitted).

The *Georgeoff* and *Price* decisions also can be harmonized with the result in *Environmental Defense Fund v. Lamphier,* 12 Envtl.L.Rep. 20843 (E.D.Va.1982). In *Lamphier,* the district court denied Virginia's section 9607(a) claim for response costs because the Commonwealth had incurred costs only for inspecting the waste site and sampling the chemicals. The actual clean-up operation had not yet started. As the *Georgeoff* court explained, the costs sought by Virginia in *Lamphier* "were not within the definition of response costs laid out in 42 U.S.C. § 9601(23–25)." 562 F.Supp. at 1316.

Response costs are defined under 42 U.S.C. § 9601(25) as the costs for removal, remedy and remedial action. Under 42 U.S.C. § 9601(23) and (24), removal and remedial actions are defined as "the cleanup or removal of released hazardous substances from the environment," and actions to prevent, minimize or mitigate damage to the public health or welfare. There is no doubt that the [Commonwealth] may have such costs in the future, *but they have not incurred them during their investigation.*

12 Envtl.L.Rep. at 20844 (emphasis added).

The decision in *D'Imperio v. United States,* 575 F.Supp. 248 (D.N.J.1983), in which the court dismissed a private landowner's complaint for declaratory relief, is consistent with *Georgeoff, Price,* and *Lamphier.* The record in *D'Imperio* reveals that the claimants had neither taken response action nor spent or proposed to spend money to clean up their land. The D'Imperio's only "incurred" expense was the government's "taking" of their property to set up fences and to perform a feasibility study, which did not constitute a recoverable cost under section 9607(a)(4)(B). *Id.* 575 F.Supp. at 251. The court concluded that even a more liberal construction of section 9607(a)(4)(B) would not change the result, "because to date [the D'Imperio's] have not taken the sort of concrete steps toward planning a site cleanup which would make them eligible for a determination as to whether such a cleanup would be reimbursable." *Id.* (This court notes, parenthetically, that the "more liberal approach" is not accepted by the other courts that have addressed the question of what constitutes an incurred response cost.)

In this case, Bulk has not taken the steps necessary to entitle it to relief under section 9607(a)(4)(B), let alone review by this court. The court recognizes Bulk's good faith effort to draft a clean-up proposal and to solicit the participation of corporate defendants, but this is not enough. The actual clean up of the release must have begun before a cost recovery action can be reviewed. The record here reveals that Bulk has neither broken ground nor taken any palliative measures; its only expenses include attorneys' fees and assessment costs. Judicial review of Bulk's case at this early juncture would be tantamount to determin-

ing liability before the start of the abatement action, which is completely contrary to CERCLA's stated purpose to encourage prompt response before adjudicating liability. *See supra* p. 1448 and accompanying notes.

Bulk argues that if the government can recover its expenses for attorneys' fees or feasibility studies, *see* EPA Memorandum, at 18–19,[28] then such costs should also be recoverable by private claimants. Sadly, plaintiff misses the point. The EPA, and Bulk for that matter, can recover costs once a clean-up action has begun or is complete. The abatement operation, if of the planned removal or remedial action variety, can start only after the government has approved of the plan. Once a claimant has taken verifiable steps to arrest the release, then he may file a cost recovery action, provided the claimant first served on the other potentially responsible parties a demand letter containing, *inter alia*, a discussion of the plan already serving as the basis for the clean-up operation.

Congress enacted CERCLA to promote and supervise the clean up of hazardous releases, not just to study them; the Act requires action before a claimant may seek its protection. Feasibility studies and clean-up proposals are important first steps in neutralizing a toxic spill, but until someone applies the studies and executes the plan, the pollution threat remains. For this reason, CERCLA requires a claimant to start cleaning up a release before it can recover its expenses. In this way, the Act provides an incentive to arrest a spill, for without identifiable progress, a claimant may not seek compensation for its response costs under section 9607(a)(4)(B). Once a claimant has begun to implement a government authorized clean-up program, then those preliminary costs heretofore non-recoverable (e.g., expenses for legal, architectural, engineering, and other planning) may be recaptured.

Plaintiff's fallback position is that unless the requested declaratory relief is granted, it will be faced with the inescapable dilemma of either cleaning up the spill and going bankrupt,[29] or ignoring the DER and the BCEQCB warnings and face prosecution for violating state and county laws. The latter possibility is of concern here, and the record before the court simply does not support Bulk's "dilemma." The notice Bulk received from the BCEQCB is but a *warning;* no subsequent action has been taken. Plaintiff's Exhibit A–1. In July

---

**28.** Among the costs listed by the EPA as recoverable under CERCLA are:

1. Investigations, monitoring, surveys, testing, and other information-gathering necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health, welfare or the environment.

2. Planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations necessary or appropriate to plan and direct response actions.

3. Planning, legal, fiscal, economic, engineering, architectural and other services necessary to recover the cost of the response actions.

EPA Memorandum, at 18.

**29.** The uncontested facts in the record demonstrate that Bulk could afford to draft and take limited measures to arrest the phthalate ester spill, and would have had the DER not rejected the company's clean-up plan.

The result in this case would not change even if the court were to accept as true Bulk's unsubstantiated claim that a unilateral clean-up effort at this point in time would bankrupt the company. If this were true, then the federal or state government's would have the option of interceding and cleaning up the site, and later moving to recover clean-up costs from other responsible parties. *Cf. supra* p. 1442 (discussing Fund-sponsored clean up when polluters are unknown). As explained in *Georgeoff,* a case in which Ohio sought to collect clean-up costs from a then-insolvent waste disposal site operator,

the information available in 1980 indicated that many of the potential defendants in [§ 9607] actions were insolvent or judgment proof. *See, e.g.,* Cong.Rec. H9175 (daily ed. Sept. 19, 1980) (remarks of Rep. Murphy); Note, 130 U.Pa.L.Rev. at 1230. . . . In light of these facts, this Court finds that Congress probably believed that there would be a substantial percentage of judgment proof defendants in these actions. Congress could not have intended to limit the potential defendants while accomplishing its purpose of making the responsible individuals pay for the cost of clean up.

562 F.Supp. at 1313.

1983, the DER notified Bulk that the matter of cleaning up the phthalate esters was being forwarded to the department's enforcement section "for appropriate action," Plaintiff's Exhibit A–15, at 2, yet to date the DER has taken no action. The possibility of prosecution here is too indefinite to warrant declaratory relief.

The court in *D'Imperio* reached a similar result. In that case, the EPA had determined that plaintiffs might be responsible for a hazardous release, and that if they failed to commence an investigation of the site as a first step toward remedial activity, then they may be held liable under section 9607. Nine months after this initial notice, the EPA proposed to place the D'Imperio's land on the NPL. Plaintiffs subsequently filed suit for a declaration that they were not liable for the cost of any clean up, and alternatively that if held so liable, then their response actions were compensable under section 9607(a)(4)(B).

The district court ruled that declaratory relief was not appropriate because of the preliminary nature of the proceedings. The court pointed out that the letter the D'Imperio's received from the EPA was equivocal, stating only that the agency "may spend public funds," that the D'Imperio's "may be a responsible party," that corrective action "may be necessary," and that the D'Imperio's "may be liable" if they failed to take response action. 575 F.Supp. at 251. Moreover, the record indicated that the EPA had sent the warning letter to the D'Imperio's

> without first determining who is legally liable; that the EPA did not, and does not, regard the notice letters as determinations of liability; that the EPA has not sought to recover any response costs … or brought any other action against them, and that the letters, in requesting the recipients to notify the agency of whether they would voluntarily undertake feasibility studies, was designed to help the EPA expedite its own investigations.

*Id.* at 252.

Admittedly, *D'Imperio* presents an easier case to resolve than the one at bar.

However, the court finds that the differences in degree do not justify a different result. A state agency in this case has indicated that an enforcement action may be forthcoming if Bulk does not clean up the Port Everglades spill, but no action has been taken for well over nine months. Moreover, the inordinate amount of time that has elapsed since the state and county first discovered the phthalate ester spill suggests a lack of urgency that is hardly indicative of an imminent government enforcement action.

Bulk is intent here to seek declaratory relief because of the undesirable legal consequences of possible future enforcement action. The threat of prosecution in this case is not so real as to require declaratory relief, especially because the threatened action does not jeopardize any of Bulk's constitutional rights, as was the case in *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974) (first amendment); *Wagner v. Simmon*, 412 F.Supp. 426 (D.Mont.1975), *aff'd*, 534 F.2d 833 (8th Cir.1976) (first amendment); *Bradford v. Wade*, 386 F.Supp. 1156, 1158 (N.D. Tex.1974), *aff'd*, 530 F.2d 973 (5th Cir.1976) (fourth amendment); and *Philadelphia Newspapers, Inc. v. Borough Council of Swarthmore*, 381 F.Supp. 228, 235 (E.D.Pa. 1974) (first amendment).

Viewed in its proper perspective, this case is based on a "purely hypothetical set of facts, conjectural in nature, and incapable of immediate and specific relief." *Tilley Lamp Co. v. Thacker*, 454 F.2d 805, 808 (5th Cir.1972). Accordingly, the court holds that Bulk's case has not advanced to such a point as to present "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality as to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.*, 312 U.S. at 273, 61 S.Ct. at 512.

### V.

By way of review, the court rules that plaintiff's case is not ripe for review because Bulk has not obtained government approval of its clean-up proposal. Without

1454

a government-approved plan, Bulk can neither serve on corporate defendants a demand letter for a "sum certain," nor incur response costs consistent with the NCP. Alternatively, even if this case was ripe for review and declaratory relief was warranted, plaintiff's complaint would be dismissed for failure to state a claim upon which relief can be granted, Rule 12(b)(6), Fed.R. Civ.P., because Bulk did not comply with a condition precedent to filing a section 9607(a)(4)(B) action, to-wit: service on corporate defendants of a demand letter. Plaintiff's state law claims also are dismissed because the court lacks an independent basis for federal jurisdiction. Accordingly, it is

ORDERED AND ADJUDGED that Bulk's complaint be DISMISSED WITHOUT PREJUDICE.[30]

---

**30.** Subsequent to completion of this decision, but before the court entered this order, plaintiff and corporate defendants filed notices of supplemental authority. The court has reviewed the parties' additional authority, and is not inclined to modify its decision. For purposes of clarity, the court briefly comments on each decision.

In *Jones v. Inmont Corp.*, 584 F.Supp. 1425 (S.D.Ohio 1984), the district court ruled, *inter alia*, that a response action taken to mitigate damage to public drinking water and farm land, *possibly* including monitoring, security fencing, and temporary evacuaton, *might* be recoverable under section 9607 if these costs could in fact be demonstrated. *Id.* at 1429–1430. The *Jones* court chose not to decide what constitutes a recoverable response cost because of the nascent procedural posture of the case. The record in the case at bar, apparently unlike that in *Jones,* is considerably more detailed and, even assuming Bulk's allegations to be true, still warrants the dismissal of the company's complaint for failure to incur any response costs in conformity with the design and purpose of CERCLA.

On a more fundamental level, *Jones* and the instant case are strikingly similar in that both decisions stress that some costs must be incurred by a claimant before it can institute a section 9607 suit. *Id.* at 1430.

The decision in *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 588 F.Supp. 515 (D.Mass.1983), like the result in *Jones,* is a function of the procedural phase of the case. The *Dedham* court did not need to define response costs because the record was not sufficiently developed to determine whether such costs, if in fact incurred, were consistent with the NCP. Still, *Dedham* is of some assistance, for the court does hold that section 9607 is to be read together with, rather than independent of, section 9612. Additionally, *Dedham,* like *Jones,* concedes the vitality of a private cost recovery action under section 9607(a)(4)(B).

There is little reason to comment at any length about the district court's decision in *Wickland Oil Terminals v. Asarco Inc., et al.,* 590 F.Supp. 72 (N.D.Cal.1984), for the analysis and conclusions in that case mirror those of this court.