**CARLYLE PIERMONT CORPORATION,**
Plaintiff,

v.

**FEDERAL PAPER BOARD CO., INC., Continental Can Co., Inc., "John Doe Corporations" 1 Through 5 and "John Doe Individuals" 1 Through 5, Defendants.**

**FEDERAL PAPER BOARD CO., INC., Third-party Plaintiff,**

v.

**FEDDER TRADING CO., INC., Bush Trading Co., Inc., Droman Realty Co., Inc., "John Doe Corporations" 1 Through 10 and "John Doe Individuals" 1 Through 10, Third-party Defendants.**

No. 89 Civ. 6302(MEL).

United States District Court,
S.D. New York.

July 11, 1990.

Spitzer & Feldman, P.C., New York City, for plaintiff; Ronald J. Offenkrantz, Michael H. Smith, of counsel.

White & Case, New York City, for defendant Federal Paper Bd. Co., Inc.; Margaret Murphy, of counsel.

Dickerson & Reilly, New York City, for defendant Continental Can Co., Inc.; John H. Reilly, Jr., Charles M. Tomaselli, of counsel.

LASKER, District Judge.

Carlyle Piermont Corporation ("Carlyle") instituted this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* (Supp.1987) ("CERCLA" or "Superfund"), and under New York common law for consequential damages, punitive damages and response costs incurred during the discovery, investigation and ultimate clean-up by excavation and physical removal of hazardous solvents from the soil on land which Carlyle now owns and seeks to develop and which defendants Federal Paper Board Co., Inc. ("Federal") and Continental Can Co., Inc. ("Continental") formerly owned and operated. Federal has asserted cross-claims against Continental, and has filed a third-party complaint against other third-party defendants for contribution and indemnification.

Federal and Continental move for partial summary judgment on the ground that Carlyle's response costs were not consistent with the requirements of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300 (1989). Federal also moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, because the only claim against it is based on CERCLA.

Carlyle cross-moves for partial summary judgment on liability, for initial investigative and monitoring costs, for attorneys' fees and for sanctions pursuant to Fed. R.Civ.P. 11.

## I.

Carlyle purchased approximately thirty acres of waterfront property in October 1986 from defendant Clevepak Corporation and Federal's and Continental's successors in interest. The property is located on the Piermont Pier, in Piermont, New York, and is bordered on the north by the Hudson River, to the south by the Piermont Marsh, a National Estuarine Sanctuary containing 944 acres of wetlands, and to the east by village parkland. Between 1964 and 1984 Continental and then Federal owned and operated a paper mill and folding carton plant on the property. One of the buildings on the property, building 41b, located in a 1.5 acre area ("the site"), was a printing facility which used various solvents, including the hazardous substances toluene, ethylbenzene and xylene, which were stored in tanks on the site.

Between November 1986 and April 1988 the Village Board of Piermont conducted and completed an environmental analysis of Carlyle's proposed development of the property and request for a zoning change, pursuant to the State Environmental Quality Review Act ("SEQRA"), N.Y.Envtl.Conserv.L., Art. 8 (McKinney 1984). Although testing and investigation during the SEQRA process had not revealed significant concentrations of hazardous substances on the site, persistent allegations of the presence of such substances there led the New York Department of Environmental Conservation ("DEC") to inspect the property in April and May 1988 and to request additional information from Carlyle. Following several weeks of soil sampling and testing by Carlyle's engineers, in conjunction with representatives of the DEC, concentrations of toluene, ethylbenzene and xylene were detected in the soil surrounding building 41b, which had been recently demolished by Carlyle.

Carlyle's project manager, Gary Koehnken, cordoned off the area and arranged for additional testing. Carlyle notified the Village Board of its discovery and decided to reopen the SEQRA process to file a draft supplemental environmental impact statement (the "DSEIS"), and, following public hearings and comment, a final supplemental environmental impact statement (the "FSEIS").

In July 1988 Carlyle's environmental consultants proposed a "Remedial Action Plan" to clean up the site. The consultants had determined, following further investigation, that unacceptably high levels of solvents were present in the soil and groundwater near an abandoned dry well on the site. The Remedial Action Plan proposed excavating approximately 100 cubic yards of soil in and around the site to determine whether the actual level of contamination was so high that the soil should be transported off-site, or whether the level was sufficiently low that the soil could be used as backfill. The Remedial Action Plan was included in the DSEIS, and later in the FSEIS, which was accepted by the Village Board at the conclusion of supplemental SEQRA proceedings.

Koehnken states in his affidavit that he and the various consulting scientists hired by Carlyle, as well as representatives of the DEC, considered various alternative remedial actions including the following: on-site encapsulation, on-site biological treatment, hog and haul removal, on-site aeration, off-site incineration, injection well steam recovery, and no action.[1]

In a letter to Federal and Continental dated July 14, 1988, Carlyle's attorney, Ronald J. Offenkrantz, informed them of the discovery of the hazardous solvents and stated:

We have reason to believe that your firm was the actual polluter of the mate-

rial found on the site and therefore has a liability to Carlyle as the owner for all costs of remediation as well as for such consequential damages as may have been incurred as a result of your use of the property.

We suggest that you place this matter in the hands of your attorneys and instruct them to contact this firm on receipt so that the matter and its resolution may be further discussed.[2]

Counsel for the defendants replied in separate letters requesting additional information and stating that they were investigating whether they had indeed owned the property.[3] Offenkrantz responded to both letters on July 27, stating in his letter to Federal:

What we seek is your cooperation in remediating the problem with DEC. We wrote to you because we intend to commence a plan of remediation and to do it promptly since to delay would result in increased damages to our client as the developer and ultimately to your client as the polluter.

We would hope that Federal Paper Board will see that it is to its advantage to cooperate in the remediation and minimize everyone's costs and liabilities.[4]

On the following day Offenkrantz wrote again to Federal and Continental to advise them that after a conference with the DEC, remediation of the site was scheduled to begin on August 15. Federal thereafter arranged for its chief engineer to visit the site on August 19 to discuss the situation with Carlyle's engineers.

On September 15, 1988, Federal's counsel, John T. Flynn, wrote to Koehnken to express Federal's concern that the speed at which a clean-up program was being planned by Carlyle, "obviously affords us no participation whatever in the remedia-

1. Affidavit of Gary Koehnken ("Koehnken Affidavit") (December 28, 1989) at 10–15.

2. Affidavit of Ronald J. Offenkrantz ("Offenkrantz Affidavit") (dated Dec. 28th, 1989), Exhibit A, Letter from Ronald J. Offenkrantz to Federal Paper Board Company, Inc., dated July 14, 1988.

3. Offenkrantz Affidavit, Exhibit A, Letter from Richard Torrito to Ronald J. Offenkrantz, dated July 20, 1988; Letter from John T. Flynn to Ronald J. Offenkrantz, dated July 26, 1988.

4. Offenkrantz Affidavit, Exhibit A, Letter of Ronald J. Offenkrantz to John T. Flynn, dated July 27, 1988.

tion program. Further, implementing same in such a hasty fashion could well result in a scientifically unsound or unnecessarily costly program." [5] Flynn also explained that Federal was still reviewing the extent of its responsibility for the Piermont site. On September 20, 1988, Margaret Murphy, outside counsel for Federal, wrote to Offenkrantz to confirm that Federal was a prior owner of the site and to state that upon receipt of additional information regarding the DEC's involvement in the situation, Federal would "cooperate in remediation of the property to the extent such remediation is required by the DEC." [6]

From September until October, when Carlyle completed excavating the contaminated soil and shipped it to a Wayne, Michigan hazardous substances landfill, Carlyle continued to attempt to involve Federal and Continental in the clean-up planning. The defendants continued to seek additional information which they asserted was necessary for them to evaluate the cost effectiveness of, and alternatives to, the proposed action. The record indicates that Carlyle became increasingly concerned with implementing its plan before November 8, 1988, the effective date for new federal prohibitions on land disposal of solvent-contaminated soil. *See* 40 C.F.R. § 268.30 (1989). The excavation and shipment of approximately 2600 tons of solvent-contaminated soil from the site to a hazardous waste disposal facility/landfill in Wayne, Michigan was completed before the November 8 deadline. Carlyle alleges that its total response costs exceed $1 million, of which $278,000 were spent for initial monitoring and investigation.

## II.

One of the major objectives of the private recovery provisions of CERCLA is to "assure an incentive for private parties, including those who may themselves be subject to liability under the statute, to take a leading role in cleaning up hazardous waste facilities as rapidly and com-

pletely as possible." *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 617 (S.D.N.Y.1986). CERCLA section 107(a), 42 U.S.C. § 9607(a) (Supp.1987), provides in relevant part that:

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ...

> (4) ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for − −

>> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

>> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

Response costs are defined, in part, as costs incurred "to reduce or eliminate the release or threat of release of hazardous substances, or pollutants or contaminants." 40 C.F.R. § 300.71(a)(1) (1989). The NCP, 40 C.F.R. § 300, contains specific requirements which parties must meet to recover response costs from other parties. These requirements differ significantly depending on whether the response for which costs are sought is deemed a "removal" or "remedial" action.

Removal actions are defined under CERCLA as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public

---

**5.** Offenkrantz Affidavit, Exhibit A, Letter of John T. Flynn to Gary F. Koehnken, dated September 15, 1988.

**6.** Offenkrantz Affidavit, Exhibit A, Letter of Margaret Murphy to Ronald J. Offenkrantz, dated September 20, 1988.

health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief Act of 1974 [42 U.S.C. § 5121 et seq.].

42 U.S.C. § 9601(23) (Supp.1987). Various courts have concluded that "Removal actions are to be taken in response to an immediate threat to the public welfare or to the environment ... and are 'primarily ... intended for the short-term abatement of toxic waste hazards.'" *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 795 (D.N.J.1989) (quoting *Piccolini v. Simon's Wrecking,* 686 F.Supp. 1063, 1068 (M.D.Pa.1988)). *See New York State v. Shore Realty Corp.,* 759 F.2d 1032, 1040 (2d Cir.1985).

Remedial actions are statutorily defined as:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations ... and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24) (Supp.1987). In sum, the line between removal and remedial actions is not precisely defined but removal actions are typically short-term measures taken to prevent immediate harm whereas remedial actions are generally long-term projects designed to effect permanent solutions. *City of New York v. Exxon Corp.,* 633 F.Supp. at 614.

The NCP requirements for remedial actions are greater than those for removal actions. To be consistent with the NCP, a party taking a remedial action must:

(A) Provide[ ] for appropriate site investigation and analysis of remedial alternatives as required under § 300.68;

(B) Compl[y] with the provisions of (e) through (i) of § 300.68;

(C) Select[ ] a cost-effective response; and

(D) Provide an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless compliance with the legally applicable or relevant and appropriate State and local requirements identified under paragraph (a)(4) of this section provides a substantially equivalent opportunity for public involvement in the choice of remedy.

40 C.F.R. § 300.71(a)(2)(ii). The NCP requirements for a removal action, by contrast, do not include provisions for "appropriate public comment" or detailed investigation and evaluation of alternative actions.[7]

Federal argues that: 1) the factual record in this case is sufficient to grant summary judgment; 2) the undisputed facts clearly establish that Carlyle's action was remedial in nature because it was not taken in response to an immediate threat to public health or the environment but rather was intended as a permanent clean up; 3) Carlyle's remedial action was not consistent with the NCP principally because it was not a cost-effective response, there was an inadequate opportunity for public

**7.** 40 C.F.R. § 300.71(a)(2) states in relevant part: [A] response action will be consistent with the NCP ... if the person taking the response action:

(i) Where the action is a removal action, acts in circumstances warranting removal and implements removal action consistent with § 300.65.

participation in its selection, and other alternatives were not sufficiently explored; 4) consistency with the NCP is a prima facie element of Carlyle's case on liability; and, accordingly, 5) Federal is not liable to Carlyle for any costs of response, including initial investigatory and monitoring costs, because it has not established liability.

Carlyle replies that: 1) the record in the case is not sufficiently developed to grant summary judgment to Federal on the question of consistency with the NCP; 2) its action was a removal action; 3) its costs of response substantially complied with the NCP and substantial, not literal, compliance is all that is required; 4) consistency with the NCP goes to damages and is not a prima facie element of liability and, accordingly, Carlyle is entitled to declaratory relief on liability; and 5) the undisputed facts establish Federal's liability for initial investigatory and monitoring response costs incurred by Carlyle because such costs need not be consistent with the NCP.

### III.

■ The first issue is whether the record is sufficient to grant summary judgment on the question of whether Carlyle's response costs were consistent with the NCP. To evaluate consistency with the NCP, it must first be determined whether Carlyle's physical excavation and disposal of the contaminated soil was a removal or remedial action and, consequently, what NCP requirements attach.

Federal asserts that all of the facts necessary to resolve the issue of consistency with the NCP are to be found in the record created by the plaintiff during the SEQRA review process, e.g. the DSEIS, FSEIS and other public documents. Carlyle emphasizes that Federal's motion was brought at the inception of this case, before any substantial discovery could take place, and that genuine issues of material fact exist as to consistency with the NCP.

Federal cites several cases in which courts have granted summary judgment on the issue of consistency with the NCP after determining that the factual records were complete. *Versatile Metals Inc. v. Union*

*Corp.*, 693 F.Supp. 1563 (E.D.Pa.1988); *Amland*, 711 F.Supp. at 794; *County Line Investment Co. v. Tinney*, No. 88–C–550–E, 1989 U.S. Dist. LEXIS 11358 (D.Okl. 1989); *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1292–93 (D.Del.1987), *aff'd*, 851 F.2d 643 (3d Cir.1988). However, Carlyle persuasively replies that in *Amland* and *County Line* summary judgment was granted only after extensive discovery was completed and in *Versatile Metals*, the court ruled after more than two months of trial. 693 F.Supp. at 1567.

Carlyle cites several cases to support its position that consistency with the NCP is a peculiarly fact intensive question that can normally only be determined at trial, or at least after a full pretrial record has been prepared. *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 695 (9th Cir.1988); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1144 (E.D.Pa.1982); *Sunnen Products Co. v. Chemtech Indus., Inc.*, 658 F.Supp. 276, 278 (E.D.Mo.1987).

We conclude that genuine issues of material fact exist and the record is insufficient to determine conclusively whether Carlyle's response was a remedial or removal action, what NCP requirements attach, and whether Carlyle complied with those requirements.

For example, Carlyle asserts that its action was a removal, not a remedial, action. The criteria established by the EPA for determining when a removal action is appropriate are:

(i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals, or food chain;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in

soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;

(viii) Other situations or factors which may pose threats to public health or welfare or the environment.

40 C.F.R. § 300.65(b)(2) (1989). Federal argues vigorously that the situation at the site met none of these criteria. Specifically, Federal asserts that the undisputed facts show that no immediate short-term action was necessary because the presence of solvents on the site did not pose an imminent threat to health or the environment. Federal relies on statements in the DSEIS by Carlyle, for instance, that the solvents detected on the site "are the same compounds that would be present, at comparable levels, if a gasoline spill had occurred in the area,"[8] and that, "the groundwater below the site is not and could never be used as a potable drinking water source because of conditions having nothing to do with the solvents."[9]

Carlyle asserts that its action was removal, not remedial, because the solvents posed a threat of migration and risk of exposure to "nearby populations" and "drinking water supplies or sensitive ecosystems," 40 C.F.R. § 300.65(b)(2). The Koehnken Affidavit states that two DEC representatives, who were purportedly involved at every stage in Carlyle's investigation of toxic solvents in the soil, indicated that the site would probably be listed as a "classifica-

tion 2" on the New York State Inactive Hazardous Waste Registry.[10] A classification 2 site is defined as: "Significant threat to the public health or environment—action required." N.Y.Envtl.Conserv.Law § 27–1305(4)(b)(2) (McKinney 1984). Michael Elder, an attorney representing various environmental groups concerned about the Piermont situation, also states in his affidavit that the solvents discovered at the site presented a health and environmental threat through possible migration to the Hudson River or the Piermont Marsh and that the DEC also informed him that "the concentration of solvents which had been found warranted a listing of the site in classification 2 ... and that the DEC intended to list the site."[11]

Federal takes the position that the statements in the Elder and Koehnken Affidavits about what the DEC intended to do are hearsay and that, in fact, the only real evidence shows that the DEC merely proposed that the site be designated a classification 2a site, which is defined as a: "Temporary classification assigned to sites that have inadequate and/or insufficient data for inclusion in any of the other classifications."[12] However, the only evidence submitted by Federal that DEC intended to give a 2a classification to the Piermont site consists of statements made at a public hearing held *after* the cleanup by Carlyle had been completed.[13]

No clarifying affidavits have been submitted by either party from DEC representatives. Indeed, Carlyle asserts that the DEC, as a policy matter, does not submit affidavits on summary judgment motions. Direct evidence as to how the DEC viewed the situation prior to Carlyle's

**8.** Affidavit of Margaret Murphy ("Murphy Affidavit") (November 22, 1989), Exhibit 1, Draft Supplemental Environmental Impact Statement, undated, at 1–6.

**9.** *Id.*

**10.** Koehnken Affidavit at 6.

**11.** Affidavit of Michael Elder (Dec. 28th 1989) at 4 (Appended to Koehnken Affidavit).

**12.** Memorandum of Federal Paper Board Company, Inc. in Reply to Plaintiff's Opposition to its Motion for Partial Summary Judgment and

to Dismiss for Lack of Subject Matter Jurisdiction, and in Answer to Plaintiff's Cross–Motion for Summary Judgment (January 26, 1990) Appendix A, Quarterly Status Report of Inactive Hazardous Waste Disposal Sites, dated October 1989, at 6.

**13.** Subsequent to Carlyle's action the site was designated by the DEC as a Classification 4: "Site properly closed—requires continued management." N.Y.Envtl.Conserv.Law § 27–1305(4)(b)(4) (McKinney 1984).

clean-up action is an important missing factor necessary to determine the extent and immediacy of the environmental threat posed by the solvents, and, accordingly, whether a removal or remedial action was appropriate.

Other genuine issues of material fact include the concentration levels of the hazardous solvents in the soil and what significance to attach to them, as well as the extent to which alternative actions were evaluated by Carlyle, the DEC and the public. Because these and other factual questions remain with regard to key factors which are determinative of whether Carlyle's action was a removal or a remedial action, and whether it was consistent with the NCP, Defendants' motions for partial summary judgment are denied.

## IV.

▮ Carlyle moves to recover its initial investigatory and monitoring costs, contending that it is entitled to such costs irrespective of both the recoverability of its other response costs or compliance with the NCP. Federal asserts that because Carlyle's entire response was remedial and did not comply with the NCP, Federal is not liable for any response costs, including monitoring and investigative costs.

At least two courts have directly held that consistency with the NCP is not a precondition to recovery of preliminary investigatory and monitoring costs. In *Artesian* the defendants conceded and the court held that "the detailed NCP provisions governing other response actions cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances." 659 F.Supp. at 1294. And in *Amland* the court, citing *Artesian*, granted summary judgment to the plaintiff on liability for preliminary monitoring and evaluation costs irrespective of consistency with the NCP. The *Amland* court held that such costs fall under the statutory definition of removal actions. 711 F.Supp. at 795.

Several courts have also permitted recovery of costs incurred in the initial monitoring and assessment of a release or threat-

ened release of hazardous substances regardless of the recoverability of other response costs. *Amland*, 711 F.Supp. at 795; *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986) (held, costs of testing and investigation recoverable even where on-site cleanup costs are not sought); *Cadillac Fairview/California v. Dow Chemical Co.*, 840 F.2d 691, 695 (9th Cir.1988) (following *Wickland* in "rejecting the distinction between investigatory costs and on-site clean-up costs"); *Artesian*, 659 F.Supp. at 1287 (same).

Federal contends that the analysis of *Versatile Metals* and *County Line*, that investigatory costs be considered as part of an overall remedial action, is more persuasive. However, those two cases are not relevant to the narrow question at hand. In *County Line*, unlike the instant case, the plaintiff conceded that its response costs, including its monitoring costs, were all part of a remedial action. Accordingly, the *County Line* court evaluated the entire response for consistency with the NCP. 1989 U.S. Dist. LEXIS 11358 at 2. There was no separate claim made by the plaintiff for initial monitoring and investigative costs. Similarly, in *Versatile Metals*, defendants, which were seeking to recover response costs from the plaintiff, admittedly incurred no investigative or testing costs because they assumed that the entire site was contaminated. The court concluded, after trial, that the defendants' entire response could be fairly characterized as remedial, and thus all costs were evaluated for consistency with the NCP. 693 F.Supp. at 1578–79.

In the case at hand, plaintiffs have incurred substantial investigatory and response costs in determining the scope of the contamination of the soil. With respect to initial investigatory and monitoring costs, the holdings of *Amland* and *Artesian* that liability for such costs may be granted irrespective of the NCP are persuasive. Carlyle has established all of the elements necessary to merit summary judgment on liability against Federal for such costs: the costs were incurred in response to a release of hazardous sub-

stances, and Federal is a responsible person because it owned and operated the facility from which such releases occurred at the time of such releases. 42 U.S.C. § 9607(a) (Supp.1987). *See Amoco Oil v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989).[14] Continental, however, denies that any solvents were released into the dry well or the soil during the time that it was an owner or operator of the site.[15] Accordingly, Carlyle's motion for summary judgment is granted with respect to Federal's liability for initial investigatory and monitoring costs but denied with respect to Continental.[16]

### V.

In view of the denial of Federal's motion for summary judgment it is unnecessary to resolve the legal question raised by Carlyle's cross motion: whether, with respect to response costs other than investigatory and monitoring costs, consistency with the NCP is an issue of liability or damages. With respect to the remaining issues, Carlyle's application for Rule 11 sanctions is without merit, in view of defendants' reasonable and non-frivolous submissions. In light of the many pending issues in this case, Carlyle's request for attorneys' fees is premature and is denied without prejudice to renewal.

\*　　\*　　\*　　\*　　\*　　\*

In sum, Carlyle's motion for summary judgment is granted with respect to Federal's liability for investigative and monitoring costs but is denied in all other respects. Defendants' motions are denied.

It is so ordered.

---

14. Federal concedes that "from time to time during the course of its operation of the solvent room minor spills of organic solvents drained to the dry well." Federal's Reply Memorandum at 43, citing Affidavit of John J. Fekner (January 25, 1990) at 12–13.

15. *See* Affidavit of Richard Irizarry (January 21, 1990).

---

16. Although Carlyle seeks $278,000 in monitoring and evaluation costs, Koehnken Affidavit at 22, the precise amount of monitoring and investigative costs remains to be determined. *See Amland*, 711 F.Supp. at 796 n. 12.