**MARRIOTT CORPORATION, a Delaware corporation, Plaintiff,**

v.

**SIMKINS INDUSTRIES, INC., a Delaware corporation; and Leon Simkins, Defendants.**

**No. 92–2541–CIV.**

United States District Court, S.D. Florida.

June 23, 1993.

---

Douglas M. Halsey and Kirk L. Burns, Miami, FL, for plaintiff.

Mark T. Kobelinski and Dennis M. Stotts, Peoples, Earl & Blank, P.A., Miami, FL, for defendants.

### MEMORANDUM OPINION

HIGHSMITH, District Judge.

On June 7, 1993 this Court issued an Omnibus Order denying Defendants' Motion to Dismiss; denying Plaintiff's Motion for Partial Summary Judgment; denying as moot Defendant's Motion to Deny or Continue Plaintiff's Motion for Partial Summary Judgment Until the Close of Discovery; and denying Plaintiff's Motion to Strike. This Memorandum Opinion explains the Court's rationale for these rulings.

### PROCEDURAL AND FACTUAL BACKGROUND

In 1948, Defendants Simkins Industries, Inc. ("Simkins") acquired a large parcel of land in the vicinity of Miami International Airport in Dade County, Florida.[1] For many years, Simkins operated a paperboard processing plant on the northern portion of the property, where it manufactured cardboard from used paper stock. On June 4, 1981, Simkins sold the southern 4.3 acres of the parcel to Plaintiff Marriott Corporation ("Marriott"). Marriott never developed the site. Marriott has, however, periodically leased it to various car rental companies. In 1990, Marriott attempted to sell the parcel. The buyer, however, discovered soil and groundwater contamination and cancelled the purchase contract. Simkins continues to own the northern portion of the property, which is leased to Budget Rent–A–Car, Inc.[2]

Marriott's action against Simkins alleges violations of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). 42 U.S.C.A. §§ 9601–57 (West 1993). Marriott attributes the contamination of its property to paper pulp sludge dumped into the ground by the Simkins plant.[3] In support of this assertion, Marriott proffers that it discovered a debris pit in 1991 on the southwestern portion of its property.[4] Inside the pit, Marriott found sludge, paint cans, rollers, brushes, wads of newspaper dated between 1959 and 1960, cardboard, wire, bottles, and other miscellaneous contents. Marriott's tests of the soil and sludge in the pit confirmed the existence of dioxin, polychlorinated biphenyls ("PCB"s), chromium, cadmium, and lead. In addition, Marriott's tests tend to show that the PCBs and other contaminants are not a product of petroleum fuel. Based on these test results, Marriott concludes that Simkins is the source of the waste and contamination found in the debris pit. Marriott, therefore,

---

1. Leon Simkins, the president and major shareholder of Simkins, is also named as a defendant in this action.

2. It appears from copies of correspondence submitted by Marriott that the Simkins plant caught the attention of the Dade County Department of Environmental Resources Management ("DERM") sometime prior to the Marriott sale in 1981. The Court has not considered the correspondence, however, because it has not been authenticated, pursuant to *Fed.R.Evid.* 901 and *Fed.R.Evid.* 803(6). Although Timothy R. Gipe, Marriott's contamination assessor, has sworn in his affidavit that these documents represent true copies of the original correspondence, he does not assert personal knowledge of their veracity. Thus, the documents lack a predicate for admissibility. Pursuant to *Fed.R.Civ.P.* 56(c), therefore, the Court declines to make any findings concerning DERM's involvement in the controversy prior to 1981 on the basis of these documents.

 Although DERM's role remains unclear at this juncture, it also appears that DERM contacted Marriott in 1991 and subsequently approved Marriott's Remedial Action Plan ("RAP") eradicating hazardous waste on the property. Again, these documents do not comply with the admissibility requirements of *Fed.R.Evid.* 901 and 803(6), and *Fed.R.Civ.P.* 56(c).

3. According to Marriott, paper pulp sludge is "a gray, clay-like material which is a by-product of paper mills that produce paper products by recycling used paper stock." (Plaintiff's Motion for Partial Summary Judgment, D.E. # 9, at 4).

4. The debris pit measures approximately 150 feet long, 75 feet wide, and eight feet deep. The site of the pit had been paved over by the time Marriott acquired the property.

seeks an award of $239,300 as reimbursement for the response costs entailed in assessing and remedying the contamination, pursuant to 42 U.S.C. § 9607(a).[5] Marriott also seeks a declaratory judgment that Simkins is liable for all future costs of cleaning up the property.

Simkins disputes Marriott's characterization of the pit's contents as paper pulp sludge, claiming that none of its plant's by-products caused the contamination. In addition, Simkins' investigations have uncovered two other possible sources of the contamination: (1) a storm water catch basin that Marriott installed above the pit; and (2) petroleum and other waste leakage from rental cars Marriott permitted to park on the property. Moreover, Simkins contends that Marriott disturbed the paved area above the pit after purchasing the property. Based on these investigations, Simkins concludes that Marriott caused the contamination and denies liability for the costs of response. Moreover, Simkins seeks dismissal of the complaint.

### SIMKINS' MOTION TO DISMISS

#### 1. *Standard of Review*

To state a claim, Fed.R.Civ.P. 8(a) merely requires a "short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The Court must "take the material allegations of the complaint and its incorporated exhibits as true, and liberally construe the complaint in favor of the plaintiff." *Burch v. Apalachee Community Mental Health Servs., Inc.,* 840 F.2d 797, 798 (11th Cir.1988)

#### 2. *Discussion*

Simkins seeks dismissal of the complaint on three grounds: (1) Marriott did not serve Simkins with a demand letter; (2) Marriott failed to obtain government approval of its clean-up proposal; and (3) Marriott's expenses are not response costs under CERCLA.

■ First, Simkins argues that a demand letter is a condition precedent to Marriott's private action for response costs under CERCLA. Because Marriott did not serve Simkins with a demand letter, Simkins asks the Court to dismiss Marriott's complaint. Simkins, however, relies on an obsolete statutory provision of CERCLA. In 1983, 42 U.S.C. § 9612(a) provided in the relevant part:

> All claims which may be asserted against the [Hazardous Substance Response] Fund ... shall be presented in the first instance to the ... person known to the claimant who may be liable under section 9607 of this title. In any case where the claim has not been satisfied within sixty days of presentation ... the claimant may elect to commence an action in court against such ... person or to present the claim to the Fund for payment.

42 U.S.C. § 9612(a) (1983). Interpreting Section 9612(a) together with Section 9601(4), which defined a claim, and Section 9607, which provided for private cost recovery actions, courts required that the plaintiff present a demand letter to potentially responsible parties as a condition precedent to a cost recovery action. *See, e.g., Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437, 1448 (S.D.Fla.1984) (Gonzalez, J.).

As amended in 1986, however, Section 9612(a) now provides:

> No claim may be asserted against the [Hazardous Substance Response] Fund

---

**5.** CERCLA provides, in relevant part, that any person who, at the time of disposal of any hazardous substance, owned or operated any facility at which such hazardous substances were disposed of, shall be liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C.A. § 9607(a)(4)(B) (West 1993).

"The national contingency plan ("NCP") is a set of regulations promulgated by the [Environ-

mental Protection Agency] that establishes procedures and standards for responding to the release of hazardous substances and sets up a process for the evaluation and selection of remedies prior to actual cleanup of a waste site." *Bunger v. Hartman,* 797 F.Supp. 968, 973 (S.D.Fla.1992). The NCP is published in the Code of Federal Regulations. 40 C.F.R. § 300 (1992).

pursuant to section 9611(a) of this title unless such claim is presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 9607 of this title. In any case where the claim has not been satisfied within 60 day of presentation in accordance with this subsection, the claimant may present the claim to the Fund for payment. No claim against the Fund may be approved or certified during the pendency of an action by the claimant in court to recover costs which are the subject of this claim.

42 U.S.C.A. § 9612(a) (West 1993). Courts that have interpreted Section 9612 as amended have consistently found that CERCLA no longer requires a demand letter as a condition precedent to a private action. In a thorough and well-reasoned opinion, which analyzed the case law, the statutory language, and the purposes of CERCLA, the First Circuit concluded that CERCLA plaintiffs need not serve a demand letter unless they seek response costs from the Hazardous Substance Response Fund ("Fund"). *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1076–82 (1st Cir.1986). Moreover, the Sixth and Ninth Circuits have found that the notice requirement of CERCLA only applies to actions against the Fund. *Idaho v. Howmet Turbine Component Co.*, 814 F.2d 1376, 1379–80 (9th Cir.1987); *Walls v. Waste Resource Corporation*, 823 F.2d 977, 981 (6th Cir.1987).[6] The Court finds these cases persuasive. Therefore, the Court concludes that Marriott did not need to file a demand letter prior to instituting this private action against Simkins.

As alternative grounds for dismissal, Simkins argues that a federal or state authority must have approved the clean-up proposal before Marriott could bring an action to recover response costs. Simkins again relies on *Bulk Distribution*, where Judge Gonzalez analyzed the relevant legislation and regulations that were in effect in 1984. First, Judge Gonzalez interpreted Section 9607(a)(4)(B), which provides in relevant part that the party responsible for the hazardous substances shall be liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C.A. § 9607(a)(4)(B) (West 1993). According to Judge Gonzalez, the language "any other necessary costs of response" indicated Congress' intent that a party incur some initial response costs before it could recover "other" response costs. *Bulk Distribution*, 589 F.Supp. at 1447. Analyzing the Environmental Protection Agency's ("EPA") regulations contained in the national contingency plan ("NCP"), Judge Gonzalez also determined that the NCP supported his conclusion that "the planned removal or remedial action should not begin until the proper authorities have approved of the clean-up plan." *Id.* at 1447.[7] Finally, Judge Gonzalez noted that the EPA had announced in a Memorandum on Cost Recovery Actions Under CERCLA, dated August 26, 1983, that "cost recovery actions should follow a partial or completed clean-up operation." *Id.* at 1448. In light of these pronouncements, Judge Gonzalez concluded that "the only practical way to safeguard the public's interest, while fairly mediating the competing concerns of the parties potentially responsible for cleaning up the release, is for the government to approve of the clean-up proposal before it is implemented by the private parties." *Id.* at 1446.

6. *See also Utah State Department of Health v. NG*, 649 F.Supp. 1102, 1104–05 (D.Utah 1986) ("Congress has now responded, making it clear that the notice requirement in section [9612(a)] applies only to the Fund.").

7. Judge Gonzalez relied primarily on Sections 300.67 and 300.68 of the NCP. Section 300.67 provided in pertinent part that planned removals of hazardous substances must be requested by the Governor of the affected State or his designee. Such requests must include a description

of the proposed planned removal. *Bulk Distribution*, 589 F.Supp. at 1447 n. 21 (quoting 40 C.F.R. § 300.67(b)(3) (1983)).

Section 300.68 provided in relevant part, that "the lead agency shall evaluate the adequacy of clean-up proposals submitted by responsible parties or determine the level of clean up to be sought through enforcement efforts." *Id.* at 1447 n. 22 (quoting 40 C.F.R. § 300.68(c) (1983)).

More recent decisions interpreting CERC-LA, however, have reached the opposite result by taking into account the EPA's 1985 revision of the NCP. *See, e.g., Richland–Lexington Airport District v. Atlas Properties, Inc.,* 901 F.2d 1206, 1208–09 (4th Cir. 1990). According to the Fourth Circuit, through the 1985 amendments to the NCP, the EPA has made it " 'absolutely clear' that the lead agency does not have to evaluate and approve a response action for clean up costs under 42 U.S.C. § 9607." *Id.* at 1208 (citations omitted).[8] Moreover, the EPA has reduced the role of government agencies in private response actions by further amending the NCP in 1990. For example, Section 300.700, the section governing activities by other persons, provides in relevant part:

> (8) Except for actions taken pursuant to CERCLA sections [9604] or [9606] or response actions for which reimbursement from the Fund will be sought, any action to be taken by the lead agency listed in paragraphs (c)(5) through (c)(7) may be taken by the person carrying out the response action.

40 C.F.R. § 300.700(c)(8) (1992). Paragraphs (c)(5) through (c)(7) include such operations as removal and remedial site evaluations. This shift in the regulations from agency to private party responsibility reinforces the prevailing judicial view that government approval prior to initiation of a private action is not required for consistency with the NCP.[9] Therefore, the Court concludes that Marriott did not need to obtain governmental approval prior to filing this private cost recovery action.[10]

■ Simkins' third argument in support of dismissal is that Marriott has failed to allege a prima facie case. To state a claim in a CERCLA cost recovery action, a party must allege the following four elements: "(1) the site where the 'hazardous substance' is found is a 'facility;' (2) there has been a 'release' or 'threatened release' of [a] hazardous substance from the facility; (3) the 'release' or 'threatened release' has caused the private party to incur 'response costs' that were 'necessary' and 'consistent with the national contingency plan;' and (4) the Defendants fall within one [of] the four classes of parties subject to the liability under the Act." *Bunger v. Hartman,* 797 F.Supp. 968, 971 (S.D.Fla.1992) (Paine, J.) (citations omitted). Simkins does not challenge the sufficiency of the complaint as to the first, second, or fourth elements. Simkins argues, however, that the complaint is defective with respect to the third element because the costs al-

---

8. *See also Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1575 (5th Cir.1988) ("We find no merit to the contention that prior governmental involvement is a prerequisite to the recouping of response costs."); *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 892 (9th Cir.1986) (The 1985 revisions would clarify that the "lead agency does not have to evaluate and approve a response action for those costs to be recovered from a responsible party pursuant to CERCLA section [9607]."); *New York v. Exxon Corp.,* 633 F.Supp. 609, 616 (S.D.N.Y.1986) ("By specifically imposing a requirement of prior approval only when reimbursement will be sought from the [Fund], the NCP ... further justifies the inference that parties ... need not seek prior federal concurrence.").

9. A court has noted that there are occasions when CERCLA requires governmental approval, based on the provisions of the Superfund Amendment and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9622. *Allied Corp. v. Acme Solvents Reclaiming, Inc.* 691 F.Supp. 1100, 1109 (N.D.Ill.1988). Congress enacted SARA in 1986 to clarify and extend CERCLA. Section 9622(e)(6) of SARA provides:

> When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

42 U.S.C.A. § 9622(e)(6) (West 1993). Thus, SARA requires potentially responsible parties to obtain governmental authorization for remedial actions when the EPA has already initiated a remedial investigation and feasibility study. *Allied Corp.,* 691 F.Supp. at 1109. The factors that trigger SARA—previous involvement by the federal government or a consent decree—are not present in this case.

10. As previously noted, Marriott may have obtained local governmental approval of its remedial action plan from DERM. Due to the inadmissibility of the correspondence supporting this inference, however, the court makes no finding on this issue at this juncture.

leged by Marriott are not qualified response costs, despite Marriott's assertion that the costs are consistent with the NCP.

In the complaint, Marriott alleges that it has drilled approximately 100 soil borings, analyzed over 100 soil samples, installed monitoring walls, and conducted other surveys and excavations in test pits, thereby incurring $239,300 in expenses. These costs, Marriott argues, fall within the definition of response costs contained in 42 U.S.C. § 9601(25). Section 9601(25) provides:

> The terms "respond" or "response" [mean] remove, removal, remedy and remedial action, all such terms (including the terms "removal" and "remedial action") include enforcement activities related thereto.

42 U.S.C.A. § 9601(25) (West 1993). According to Section 9601(23):

> The terms "remove" or "removal" [mean] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessar[ily] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances.

42 U.S.C. § 9601(23) (West 1993). Applying these definitions, the Fifth Circuit has found that investigatory costs, such as drilling holes in the property and analyzing samples, are response costs. *Tanglewood East Homeowners v. Charles Thomas, Inc.*, 849 F.2d 1568, 1575 (5th Cir.1988) ("Investigatory costs fall within the ambit of [Section 9601(23) ]."). *See also Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986) ("The distinction that [the defendant] attempts to manufacture between investigatory costs and on-site cleanup costs is immaterial under section [9607(a) ].").[11] The Court concludes, therefore, that the investigatory and monitoring costs alleged in the complaint are response costs.

■ Simkins further argues that Marriott cannot recover these investigatory and monitoring costs because it has not yet commenced clean-up. Simkins cites no case law for this proposition, but the Court believes Simkins again relies on *Bulk Distribution.* 589 F.Supp. at 1452 ("CERCLA requires a claimant to start cleaning up a release before it can recover its expenses."). In *Bulk Distribution,* Judge Gonzalez stated that the purpose of CERCLA was "to promote and supervise the clean up of hazardous releases, not just study them." *Id.* Thus, he reasoned, a claimant must take action before seeking compensation. *Id.*[12]

As previously stated, however, a prima facie case under CERCLA does not include the implementation of clean-up programs; all that is required is that a release of hazardous substance cause necessary response costs consistent with the NCP. *Bunger v. Hartman,* 797 F.Supp. 968, 971 (S.D.Fla.1992) (Paine, J.).[13] "The distinction between investigatory costs and actual cleanup costs is 'immaterial' because CERCLA expressly provides for recovery of the costs of monitoring, assessment, and evaluation." *Artesian Water,* 659 F.Supp. at 1287 (citing *Wickland,*

---

11. District courts addressing the issue have generally come to the same conclusion. *See, e.g., Carlyle Piermont Corp. v. Federal Paper Bd. Co.,* 742 F.Supp. 814, 821 (S.D.N.Y.1990) (Initial and investigatory costs are response costs.); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 795 (D.N.J.1989) ("Any initial monitoring and assessment of the threatened release ... fall within the statutory definition of removal actions."); *Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1285 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988) ("The expenses of monitoring and evaluation are response costs within the meaning of CERCLA."); *City of New York v. Exxon Corp.,* 633 F.Supp. 609, 618 (S.D.N.Y.1986) (The costs of collecting and analyzing groundwater samples are sufficient to establish that the plaintiff has incurred response costs.). *But see State ex rel. Brown v. Georgeoff,*

562 F.Supp. 1300, 1315–16 (N.D.Ohio 1983) (Investigatory costs are not within the definition of response costs. Section 9607(a)(4)(A) requires that the complaint sufficiently allege costs incurred.).

Even *Bulk Distribution,* on which Simkins relies heavily, permitted recovery of initial investigatory costs. *Bulk Distribution,* 589 F.Supp. at 1452.

12. *See also United States v. Price,* 577 F.Supp. 1103, 1110 (D.N.J.1983) ("The government must first begin the cost of the clean-up and incur some expenses before it can initiate an action.").

13. *See also Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989); *Wickland,* 792 F.2d at 892.

792 F.2d at 892). Therefore, Marriott need not allege the commencement of clean-up procedures as part of its complaint.[14]

## MARRIOTT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### 1. Standard of Review

"A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." *Fed. R.Civ.P.* 56(c). In deciding motions for summary judgment, the Court must use as its guide the standard set forth in *Fed.R.Civ.P.* 56(c), which states in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The United States Supreme Court has addressed the standard for summary judgment, as set forth in Rule 56(c), as follows:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

After the moving party has met this initial burden, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). *Fed.R.Civ.P.* 56(e), however, does not permit the nonmoving party to avoid summary judgment by resting on the pleadings, but "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, the mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

### 2. Discussion

In its motion for partial summary judgment, Marriott prays for a judgment of liability against Simkins for all of the response costs resulting from the contamination of its property. Marriott seeks both an award of $239,300 for investigatory costs and a declaration of Simkins' liability for the yet unde-

---

14. In this regard, the Court finds no merit in Simkins' suggestion that an action for declaratory relief is inappropriate because Marriott has not yet commenced clean-up procedures. Title 28, United States Code, Section 2201(a) permits a declaratory judgment action in "a case of actual controversy." 28 U.S.C.A. § 2201(a) (West 1992).

That is, under the facts alleged, there must be a substantial continuing controversy between the parties having adverse legal interests. The continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury. *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985) (citations omitted). In a CERCLA action, "once some expenditure has been made, the controversy is sufficiently real to permit the court to issue a declaratory judgment on defendant's lia-

bility." *Bowen Engineering v. Estate of Reeve*, 799 F.Supp. 467, 476 (D.N.J.1992) (citation omitted). Moreover, a plaintiff must incur some costs to have an actual controversy. *United States v. Northeastern Pharm. & Chem. Co.*, 579 F.Supp. 823, 852 (W.D.Mo.1984), *rev'd on other grounds*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).

Marriott alleges that it has been harmed by Simkins' conduct during Simkins' ownership of the property. It is clear that there are hazardous products on the property and that Marriott has spent money to investigate the problem. Because an expenditure has been made, the Court finds that Marriott's injury is not speculative. Therefore, the Court concludes that Marriott's claim for declaratory relief satisfies the threshold requirement of actual controversy for a declaratory judgment action.

termined clean-up costs.[15]

To succeed on its motion for partial summary judgment, Marriott must prove all four elements of the prima facie case under CERCLA. Marriott claims that no genuine issue of material fact exists as to any of the four elements of the CERCLA prima facie case. Thus, Marriott claims that it has proved the following facts: (1) the Marriott property is a facility under the meaning of CERCLA; (2) there has been a release of hazardous substance from the facility; (3) the release has caused Marriott to incur necessary response costs that are consistent with the NCP; and (4) Simkins owned the facility at the time of the release of the hazardous substance. *See Bunger v. Hartman,* 797 F.Supp. 968, 971 (S.D.Fla.1992) (Paine, J.). There is no factual dispute as to the first and second elements. Simkins argues, however, that Marriott has failed to prove the third and fourth elements of its prima facie case.

a.  *Third Element of Prima Facie Case: Consistency of Marriott's Response Costs with the NCP.*

■ Simkins argues that Marriott has failed prove that its response costs are consistent with the NCP. The standards for consistency with the NCP differ with respect to initial investigatory costs and clean-up costs. Courts that have addressed the issue of investigatory costs' consistency with the NCP are in agreement that these costs are recoverable irrespective of their consistency with the NCP.[16] This is because "the detailed NCP provisions governing other response actions cannot reasonably be applied

to preliminary monitoring and evaluation of a release of hazardous substances." *Artesian Water,* 659 F.Supp. at 1294. The Court finds this reasoning persuasive. Therefore, Marriott need not prove consistency with the NCP for its investigatory costs.

■ Marriott also seeks a declaratory judgment of liability against Simkins for future clean-up costs. Courts addressing this issue have granted partial summary judgment for liability for investigatory costs, but not for future clean-up costs nor costs inconsistent with the NCP. *See, e.g., Amland,* 711 F.Supp. at 801 (Clean-up costs that are inconsistent with the NCP are not recoverable.); *Carlyle,* 742 F.Supp. at 821–22 (Genuine issues of material fact exist as to whether clean-up costs were consistent with the NCP.); *Artesian Water,* 659 F.Supp. at 1294, 1299 (Motion for partial summary judgment granted only for initial monitoring costs, denied as to costs related to economic losses and future clean up costs.). These courts have implemented the modern rule, which this court has adopted, that consistency with the NCP is an element of the prima facie case for a CERCLA action.

Generally, "[a] private party response action will be considered consistent with the NCP if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements and ... results in a CERCLA quality cleanup." *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514 (10th Cir.1990). Marriott, however, has not proffered any admissible evidence that would support a finding of consistency with the NCP.[17]

15.  Although Marriott characterizes its motion as one for partial summary judgment on the issue of liability, the motion encompasses all of the issues raised in the complaint. The only relief that is not addressed in the motion—damages for clean-up costs—is not included in the declaratory judgment complaint either. Apparently, Marriott plans to seek these damages through subsequent proceedings.

16.  *See Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467, 477 (D.N.J.1992) (Initial costs need not be consistent with the NCP.); *Carlyle Piermont Corp. v. Federal Paper Bd. Co.,* 742 F.Supp. 814, 821 (S.D.N.Y.1990) ("With Respect to initial investigatory costs and monitoring costs, ... lia-

bility for such costs may be granted irrespective of the NCP."); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 795 (D.N.J.1989) ("Initial monitoring costs are recoverable even absent any subsequent recoverable response costs."); *Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1294 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988) (Preliminary monitoring and evaluation costs of a release of hazardous substances are recoverable irrespective of compliance with the NCP.).

17.  As previously noted, Marriott has submitted correspondence between Marriott and DERM regarding DERM's approval of Marriott's clean-up plan, which the Court has found inadmissible.

Marriott argues that the mere expenditure of investigatory costs is sufficient to prove consistency with the NCP. Marriott relies heavily on *Weyerhaeuser Corp. v. Koppers Co., Inc.*, 771 F.Supp. 1406, 1414 (D.Md. 1991). The *Weyerhaeuser* court held that investigatory costs are *consistent* with the NCP, and from this premise inferred consistency with the NCP. *Weyerhaeuser*, 771 F.Supp. at 1414–15. Respectfully, the Court declines to follow the District of Maryland in this leap of logic. The Court has previously stated that investigatory costs are recoverable irrespective of their compliance with the NCP. Clean-up costs, however, require NCP compliance. Therefore, the Court finds that Marriott has failed to carry its burden of proof on the issue of consistency with the NCP, as to clean-up costs.[18]

b. *Fourth Element of the Prima Facie Case: Simkins' ownership of the property at the time of the release of a hazardous substance.*

█ CERCLA authorizes suit against the owners or operators of a facility at any time in the past during a release of a hazardous substance. *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990). "Prior owners and operators are liable only if they owned or operated the facility at the time of disposal of any hazardous substance." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985) (citation omitted).

As proof of Simkins' ownership at the time of the release, Marriott has supplied the Court with the affidavits of Timothy R. Gipe,

project manager of Sterns, Conrad, & Schmidt, a contamination assessment firm; William J. Ginn, president of Resource Conservation Services, a consulting firm; Terrence Burke, an employee of Marriott; and Albert Masciarelli, a former employee of Marriott. Simkins offers the opposing affidavit of Jose A. Alvarez, a geologist and regional manager of ViroGroup, Inc., Missimer Division.[19] A review of these affidavits establish the following undisputed facts:

(1) Simkins owned the property in question from 1948 until the Marriott sale in 1981; and Simkins operated a paper mill factory on the property during that time. (Affidavit of Alvarez, D.E. # 18, at 3); (Affidavit of Burke, D.E. # 10, at 1).

(2) Simkins had paved over the southwestern portion of Marriott's property with asphalt prior to 1981. (Affidavit of Masciarelli, D.E. # 10, at 1); (Affidavit of Burke, D.E. # 10, at 2).

(3) After acquiring the property, Marriott periodically leased it to various rental car companies. (Affidavit of Alvarez, D.E. # 18, at 9).

(4) Marriott discovered a pit in the southwestern portion of the property. (Affidavit of Gipe, D.E. # 10, at 3); (Affidavit of Alvarez, D.E. # 18, at 3).

(5) The debris pit contained grey sludge, chopped news paper, paint cans, paint brushes, rags, wire, and bottles. (Affidavit of Gipe, D.E. # 10, at 3).

(6) These materials in the pit evidenced the presence of PCBs, lead, and dioxin con-

Although approval by a local agency may support Marriott's claim of NCP consistency, the Court has declined to consider this evidence for failure to comply with *Fed.R.Evid.* 803(6) and 901, and *Fed.R.Civ.P.* 56(e).

18. The District of New Jersey has held defendants liable for future clean-up costs without proof of compliance with the NCP. *See, e.g., Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994, 1000 (D.N.J.1988) ("A finding that the type of recovery [plaintiff] seeks is included within the meaning of response costs is sufficient at this stage," to grant summary judgement on the issue of liability.); *T & E Industries Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 709 (D.N.J.1988) ("While the determination of whether such costs

were 'necessary' and 'consistent with the National Contingency Plan' does preclude this court from entering summary judgment as to specific amounts of the costs, the question of amount can be dealt with at a later time."). These courts, however, interpreted compliance with the NCP as relevant to the damages determination, not the prima facie case. In fact, in *T & E Industries* the court did not even consider consistency with the NCP as part of a prima facie case. 680 F.Supp. at 708.

19. Marriott submitted a motion to strike portions of the affidavit of Jose A. Alvarez. The Court has denied this motion as moot because it has not relied on the contested portions of Mr. Alvarez's affidavit.

tamination.[20]  (Affidavit of Gipe, D.E. # 10, at 4).

(5) The larger concentrations of contamination reside six feet of soils above the grey sludge.  (Affidavit of Alvarez, D.E. # 18, at 6–7).

(6) Marriott installed a storm water catch basin directly above the pit.  (Affidavit of Alvarez, D.E. # 10, at 7).

These undisputed facts support contradictory inferences concerning the source of the contamination.  Marriott argues that the sludge, a paper mill by-product, caused the contamination.  (Affidavit of Gipe, D.E. # 10, at 6); (Affidavit of Ginn, D.E. # 10, at 2–4).  On the other hand, Simkins argues that the large concentrations of contamination above the sludge preclude its being the source because contamination does not leach upward. (Affidavit of Alvarez, D.E. # 18, at 6–7). Moreover, according to Simkins, Marriott's storm water catch basin may have been the source of the contamination.  *Id.* at 7.

The remaining assertions in the affidavits also present the Court with two disputed material facts.  First, Marriott states that the contamination was not petroleum fuel related.  (Affidavit of Gipe, D.E. # 10, at 6). Simkins' tests, however, led it to the conclusion that some of the contamination was related to waste from rental cars that parked on the property.  (Affidavit of Alvarez, D.E. # 18, at 10).  Second, Marriott states that it never disturbed the pavement above the pit. (Affidavit of Masciarelli, D.E. # 10, at 1–2; Affidavit of Burke, D.E. # 10, at 1–2).  Sim-

kins, however, asserts that yearly photographs of the site indicate that Marriott disturbed the ground over the pit.  (Affidavit of Alvarez, D.E. # 18, at 4).

Based on this review of the record, the Court finds that there are genuine issues of material fact and conflicting inferences from the undisputed facts regarding ownership of the property during the release of the hazardous substances.  Therefore, the Court denies Marriott's motion for partial summary judgment with respect to both Marriott's clean-up and investigatory costs.[21]

## CONCLUSION

Based upon the above consideration, the Court finds that Marriott has successfully pled a claim for relief under CERCLA.  The Court further finds that Marriott has not proven a prima facie case under CERCLA because there are issues of material facts concerning the cause of the contamination. Moreover, Marriott has not complied with the NCP for recovery of clean-up costs.  Accordingly, the Court finds that Marriott is not entitled to partial summary judgment under *Fed.R.Civ.P.* 56.

DONE AND ORDERED.

20.  These chemicals are hazardous substances under CERCLA.  42 U.S.C. § 9601(14); 40 C.F.R. § 302.4.

21.  The Court's denial of Marriott's motion for partial summary judgment has rendered moot Simkins' motion to deny Marriott's motion for summary judgment because the Court found that

there was enough evidence to establish genuine issues of material fact.  "The district court is not required to await the completion of discovery before ruling on a motion for summary judgment."  *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1316 (11th Cir.1990).